Richard F. KLONOSKI, M.D., et al., Plaintiffs, Appellants,

v.

Benjamin MAHLAB, M.D., et al., Defendants, Appellees.

No. 97–1976.

United States Court of Appeals, First Circuit.

Heard April 6, 1998.

Decided Sept. 23, 1998.

Joan A. Lukey, with whom Hale and Dorr LLP, Michael G. Bongiorno, and John T. Gutkoski were on brief for appellants.

Ronald L. Snow, with whom Orr & Reno, P.A., James P. Bassett, and Cordell A. Johnston were on brief for appellees.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

BOWNES, Senior Circuit Judge.

This is an appeal from a jury verdict of no liability in a medical malpractice case. Plaintiff-appellant is Richard K. Klonoski, M.D., who brought suit on his own behalf for loss of consortium, as administrator of the estate of his wife Jolanta, and on behalf of their three children.[1] Defendants-appellees are Benjamin Mahlab, M.D., Mary Hitchcock Memorial Hospital, Inc., and Hitchcock Clinic, Inc.

We address only one of the three issues raised by appellant because it is dispositive. On the thirteenth day of trial during cross-examination of Dr. Klonoski, the last witness in plaintiff's case, defendants disclosed for the first time and used letters written by Mrs. Klonoski to her sister in Poland. Excerpts from the letters were allowed in evidence. Neither Dr. Klonoski nor his attorneys knew of the existence of the letters prior to this time, despite a court order requiring disclosure of such information prior to trial. We find that this constituted trial by ambush. We vacate the judgment below and remand for a new trial.

## I.

### BACKGROUND

Jolanta Klonoski and her husband, Dr. Klonoski, were the parents of two children: Brian, born in Poland, and Karina, born in the United States. Dr. Klonoski was born and raised in Connecticut. He received his medical training in Poland where he met and

married his wife. After he finished his medical training, he, his wife, and their son, Brian, moved to the United States. Mrs. Klonoski became pregnant with their third child in September or October of 1992. At that time Dr. Klonoski was employed by Mary Hitchcock Memorial Hospital as a cardiologist. On Saturday, May 8, 1993, at approximately 11:15 a.m., Mrs. Klonoski went to the Birthing Pavilion of the Dartmouth–Hitchcock Medical Center because of vaginal spotting. She was sent home in the afternoon. Mrs. Klonoski returned to the Birthing Pavilion that night about 9:00 p.m. complaining of severe epigastric pain. She remained in the hospital until her death on Monday, May 10, of a massive cerebral hemorrhage. Prior to Mrs. Klonoski's death she was delivered of a healthy baby girl, subsequently named Caroline.

Dr. Klonoski was in San Diego at a medical meeting of cardiologists on Saturday, May 8. He was notified late Saturday of his wife's admission to the hospital. He flew home on Sunday, arriving at the hospital late in the day. His wife was comatose and did not recognize him. After conducting his own investigation into the cause of his wife's death, Dr. Klonoski consulted with an obstetrician in Connecticut and then brought suit.

### PRETRIAL DISCOVERY

As is usual in a well prepared medical malpractice case, both sides engaged in extensive pretrial discovery and, as is also usual, the parties squabbled about what information should or should not be disclosed. Over a year prior to trial, plaintiff disclosed, as part of the discovery process, the address in Poland where Mrs. Klonoski's father and sister lived, the address to which her letters (the evidence in dispute) were sent.

The district court issued a nineteen-page discovery order on July 19, 1996, covering disputes between the parties. In part of its order, the court stated:

defendants shall produce a list of all persons known by them to possess discoverable information related to: (1) marital discord between Dr. and Mrs. Klonoski;

1. For ease of reference, we will refer to all members of the plaintiff group in the singular.

and (2) the paternity of Dr. Klonoski's youngest daughter. To the extent defendants can more persuasively support their assertion that such a list (or the names of particular people which would otherwise appear on such a list) is protected by the work product doctrine (i.e., with references to precedent and/or scholarly writings on the subject), they shall provide plaintiffs with a privilege log as contemplated by Fed.R.Civ.P. 26(b)(5) *and* a list of cases and/or scholarly writings which specifically support their claim of privilege. Plaintiffs will, of course, then be free to file an appropriate motion to compel.

In its conclusion the court ordered:

Defendants shall produce a list of the names of individuals having knowledge of discoverable information relating to the issues of marital discord and paternity *and* a general description of the nature of that information on or before August 14, 1996. To the extent that defendants are able, in good faith, to legally support an assertion of privilege with regard to some or all of those names, they shall produce a privilege log as described above.

A final pretrial order was issued on December 19, 1996. It provided that a jury would be drawn on January 7, 1997, and the presentation of evidence would commence on January 13. The order noted that both parties had submitted requests for jury instructions. After noting that some motions in limine had been filed, the court gave the parties until December 31, 1996 to file additional motions in limine, with objections to be filed not later than January 10, 1997. Exhibits were to be premarked and submitted, along with any objections, not later than January 7, 1997. Defendants were ordered to "disclose all documents ordered disclosed after close of business on December 27, 1996, forthwith [sic]."

The penultimate paragraph stated in pertinent part:

All counsel and the court anticipate conducting a brief *Daubert* hearing prior to the testimony of plaintiffs' psychological expert, who is expected to testify as to the loss of enjoyment of life, or hedonic damage, aspect of the estate's wrongful death claim. The court expects that that hearing will be held at some point during the first week of trial as is convenient to counsel, and the parties agree that one hour should be sufficient.

The order also required a "final will-call witness list." The final paragraph exhorted the parties to try to settle the case. It would appear from the order that all discovery had been completed and the case was ready for trial.

### DIRECT EXAMINATION OF DR. KLONOSKI

We next set forth the pertinent parts of Dr. Klonoski's testimony.

After moving from Poland to the United States, Mrs. Klonoski wrote frequently to her family in Poland and sent packages to them. Her father visited her and Dr. Klonoski, and stayed for six months. She was quite happy when he was there, but felt lonely when he went back to Poland. Dr. Klonoski was working long hours at the hospital in Connecticut where he was training. Consequently, he was not spending much time at home with his family. His wife complained about the long hours he had to spend at the hospital. Mrs. Klonoski was thirty-five years of age. She did not have a driver's license and was "house-bound" with their two small children.

In early 1990 there was a period of stress in the marriage. Dr. and Mrs. Klonoski "had some strong discussions." "[T]here was a lot of stress between us." The problem was that Mrs. Klonoski wanted her husband to spend more time at home with the family. He could not accommodate her because he was in the residency program at the hospital which required that he spend a great deal of time there.

Dr. Klonoski became angry at his wife and filed for divorce. The divorce proceedings remained pending for four or five weeks. The couple did not stop living together during this period. There was more stress in the house, "but everything typically went on." At the end of the five-week period Dr. Klonoski and his wife talked things out and decided that they did not want a divorce, so

the divorce proceeding was dropped. In May of every year, Dr. Klonoski gave his wife one rose for each year that had passed since their first meeting in Poland. In May of 1990 the doctor followed this ritual.

Things eventually changed "tremendously" for the better. Dr. Klonoski completed his residency program in June of 1990 and he went on to a sub-specialty program. This enabled him to spend more time with his family. Mrs. Klonoski became pregnant in June of 1990.

Dr. Klonoski had been accepted into the cardiology program at the Mary Hitchcock Memorial Hospital and the Hitchcock Clinic in 1989. The family moved to Lebanon, New Hampshire, in June of 1990. Mrs. Klonoski was excited about the move. It was "a new stage in [their] lives." When the Klonoskis relocated to Lebanon, Mrs. Klonoski was pregnant, their oldest child, Brian, was six, and their daughter Karina was three. A short time later, in July 1990, Mrs. Klonoski had a miscarriage. She was treated by doctors at the Dartmouth–Hitchcock Clinic.

Mrs. Klonoski could not reconcile herself to the fact that her husband had to work harder than Polish doctors. She did not like his going to medical conferences because he was away from the family too much. Outside of this, things were "going great" between Dr. Klonoski and his wife. She "blossomed" and became very self-confident and self-reliant. She obtained a driver's license just before she left Connecticut for New Hampshire. This helped a lot because she could go places with the children and do things.

In October of 1990 she obtained a job as a bank teller. She also attended Lebanon College. After she had been there a time, she was offered a position teaching Polish but refused because she did not want to take too much time away from the family. She was devoted to the children.

Mrs. Klonoski became pregnant again in the fall of 1991. She suffered another miscarriage. Both spouses were devastated. Routine testing was advised and Dr. Klonoski encouraged his wife to take the tests. She did not, however, take all of the tests. Generally speaking, Mrs. Klonoski was healthy. She exercised by doing calisthenics and running.

Mrs. Klonoski made a lot of friends in Lebanon. She was ebullient, very outgoing, very effervescent. Dr. and Mrs. Klonoski socialized occasionally, but were not party people. They preferred to spend their leisure time together as a family.

Mrs. Klonoski became pregnant again in September or October of 1992. Both spouses were worried because of the prior miscarriages. This was the pregnancy that ended in the birth of a daughter, Caroline, and Mrs. Klonoski's death.

There was considerable testimony about Mrs. Klonoski's physical condition during the pregnancy. She did not complain to her husband excessively. In early spring, 1993, Dr. Klonoski accepted a fellowship at Massachusetts General Hospital in Boston. His wife was concerned about moving to Boston.

The family attended Dr. Klonoski's brother's wedding on April 24, 1993. He was an usher and his son, Brian, was the ring bearer. A videotape taken at the wedding showing his wife and daughter was presented to the jury. This was a good period during their marriage marred only by the worries both had about the pregnancy and the move to Boston.

Dr. Klonoski was away at a medical conference in San Diego the week his wife was admitted to the hospital. The conference was important to his career because of the knowledge he would get in his specialty and as a job forum. He had skipped two prior conferences, once because his wife had asked him not to go and another time because she had recently had a miscarriage. Mrs. Klonoski was "not thrilled" about his going to the conference, but she did not ask him not to go. Other doctors and some nurses from the Hitchcock Hospital–Clinic establishment also attended the conference in San Diego. Dr. Klonoski left for the conference on May 5; his return was scheduled for May 9. His wife's due date was May 28. Before he left he bought her a bouquet of her favorite flowers for Mother's Day on May 9. At the time Dr. Klonoski left, Mrs. Klonoski had not exhibited any signs of serious problems. He

was not even aware that his wife was ill when he left.

Dr. Klonoski called home on Friday evening. His wife told him that everything went fine at her prenatal visit, but that she did not feel well and if she continued to feel badly, she would go to the doctor the next day. She called the next day and told him that she continued to feel poorly and was going to the hospital. She did not mention vaginal bleeding. We have already related the essentials of what happened at the hospital when Dr. Klonoski visited his wife. She was comatose by the time he arrived at the hospital and did not recognize him. He was informed by a neurosurgeon that his wife was brain-dead due to a massive hemorrhage of her brain. He was with her when the life supports were disconnected and she died.

Direct examination of Dr. Klonoski drew to a close with his statement, "I loved my wife without reservation, and I still love her."

### CROSS–EXAMINATION OF DR. KLONOSKI

On cross-examination, it was established that Dr. Klonoski was suing, inter alia, as administrator of his wife's estate. He acknowledged that his wife did not have a will and he knew he would receive the first $100,000 of his wife's estate.

It was brought out that initially after their marriage his wife stayed in Poland for a time while he was in the United States working as a medical clerk. During this time he and his wife corresponded regularly. All of his wife's letters to him were written in Polish. In response to questions he stated that his wife had an older sister, named Marta.

Dr. Klonoski testified, as he had on direct examination, that his wife's father had visited in the fall and winter of 1989–90. Other than Christmas cards, he had not stayed in touch with his wife's family and had not sent them photographs of the children subsequent to his wife's death.

There was a series of questions about his wife's plans for the future. He testified that he had no specific information about his wife's future plans. He did not know any of his wife's friends who worked at the same bank as she did. He had never met any of his wife's work-colleagues.

Dr. Klonoski testified that he and his wife planned the pregnancy that resulted in her death and the birth of their third child, Caroline. He testified that everybody in the cardiology department was very helpful and supportive after his wife's death. Money was collected for his family and food was prepared for the children and himself. All of this was very helpful and he appreciated what was done.

Then followed a series of questions setting the stage for the use of the letters that are the heart of this appeal. Dr. Klonoski acknowledged that he was seeking damages for injury to the marital relationship with his wife and damages for his wife's loss of enjoyment of life. In answer to a question, Dr. Klonoski agreed that the quality of the marital relationship would be an important factor in the enjoyment of life. He also agreed that a good marriage would improve the quality of life. Dr. Klonoski testified, as he had on direct examination, that by the time he and his wife and their two children moved to Lebanon, the marriage was getting along much better; the primary ongoing issue was the time he spent away from the house and family.

In answer to a question, Dr. Klonoski testified that he knew that his wife corresponded with her father and sister, Marta, in Poland. Dr. Klonoski was then asked: "[I]f I were to show you a letter, you'd certainly be able to recognize your wife's handwriting; is that right?" The answer was "Yes, I would." After Dr. Klonoski testified that his wife's sister lived in Krakow, defense counsel began to show the witness a document marked for identification. At this point, plaintiff's counsel requested a bench conference. The request was granted.

We feel it necessary to quote at length the bench conference.

MS. LUKEY: I don't have a clue what this is, but it's never been produced in discovery, and there is absolutely no question that we requested anything that they intend to use in this case. I have no idea where it came from or what it might be.

And I assume it's in Polish, so I can't read it, but really this is unfair.

THE COURT: What is it?

MR. BASSETT: It's impeachment. This is a letter written by Mrs. Klonoski to her sister Marta in Poland. And this letter happens to have been written in late April of 1993 and early May of 1993, and it contains in it a description of a number of things, most prominently the marital relationship and the significant problems that Mrs. Klonoski believed existed at that time, and I don't believe—we actually just got that letter last night.

MS. LUKEY: Your Honor, we had, as you recall, a court-ordered disclosure from them pertaining to anything to do with alleged marital discord. This was not disclosed to us. I don't know where it came from. I don't know what he's doing, but it obviously doesn't give me the opportunity to speak, for example, to his sister—her sister, if that's the recipient. I really think this is litigation by ambush and totally inappropriate. This is a situation with an actual court order.

MR. BASSETT: Your Honor, it's legitimate cross-examination. We just got that last night based on the testimony that we had heard in this case, and it's legitimate cross-examination. We are not required to disclose what we are going to use on cross-examination.[2] We specifically brought it up with the Court, and you said for impeachment and credibility, we did not have to disclose it, and we didn't have it until last night. But in any event, we want to use it for that purpose, and I think Attorney Lukey is entitled to go into those issues on reexamination.

MS. LUKEY: Your Honor, he may not have to disclose it on a trial exhibit list, but in discovery he certainly has to disclose it

if he has knowledge of it, and we actually had to get a court order to get their evidence on marital discord. That was the reason we asked for it.

THE COURT: But he didn't have it.

MR. BASSETT: Didn't have it until last night.

MS. LUKEY: He should have had it, and what is it that they're contending justifies ambushing us with it at this moment in time.

. . . .

MR. BASSETT: We, frankly, haven't had the entire thing translated yet because it was received—this one was received this morning actually. All we have had is a skeletal translation of it, your Honor, but I think at this point it's an admission by a party opponent. It's her letter, and that's how it would come into evidence.

THE COURT: What does it say?

MR. BASSETT: Well, it says quite a few things. He can translate it for us.

THE COURT: I can't determine the relevance of "quite a few things." That's not relevant.

MR. BASSETT: I'll read you my understanding of it, but it's—this is the last letter from Jola. This is a paraphrasing of it right now, your Honor. We would ask him to read it because he can read Polish and he can translate it.

She goes on to the subject of his—of the pregnancy: I'm afraid of what's going to happen. He cares only about his career. I was surprised by his announcement that he was leaving for California and for a business trip.

There are problems with her spending habits. He doesn't like it. I bought a baby stroller, and he screamed at the top

---

2. The defendants claim that "there was a pretrial discovery order stating that exhibits to be used only on cross-examination need not be disclosed." Def. Br. At 34. Defendants state that "[t]his order does not appear in the record, but the plaintiff acknowledged on the record that the parties did not have to disclose exhibits used for cross-examination. *See* RA at 3657–58." *Id.* at 34 n. 19. We have read the record pages cited and cannot find any concession by the plaintiff's attorney that the asserted off-the-record ruling was ever made. Defendants' citation to the record on appeal contains the material in the text, and Attorney Lukey's response to it. The cited pages show *defense* counsel, not Attorney Lukey, making such a claim. We note, too, that any such ruling by the court would have exempted considerably more material from disclosure than the discovery rules provide. We think it rather strange that, if such a broad ruling had been made, it is not in the record.

of his lungs. I think we should get a divorce.

She mentions that Richard is working so hard to become a cardiologist. She doesn't say her situation will improve directly, but intimation is she has a stake—I don't understand what all that is. I don't, frankly, know what everything is in there, but just the fact that she says she thinks we should get a divorce is enough, your Honor. And he can translate it.

And its an admission.... This is a party-opponent admission. And just as we're entitled to make the arguments that outweigh it, so, too, Attorney Lukey can.

There are three more—four more of those. That's the first of the ones that I intend to offer in evidence.

MS LUKEY: I would like to know how long they've known of the existence of these letters regardless of when they may have received this one.

MR. BASSETT: I'll make a representation of that.

THE COURT: How long have you known?

MR. BASSETT: We've known about them, it's no more than two days. We received the first of them—

THE COURT: No, no.

MS. LUKEY: How did you know they were there?

MR. BASSETT: We found Marta this week. We found her three days ago. We looked for her father.

MS. LUKEY: He's dead.

MR. BASSETT: And he's dead; that's right. He died last winter. That's who we were trying to find. Instead we found Marta this week, and I can certainly get somebody to prepare an affidavit to say that she was not spoken to until two days ago, and in fact we didn't get the first transcript of these letters until yesterday afternoon. They were faxed from Poland last night. The meeting with Marta took place last night in Poland. They were faxed to us, and I spent most of the night up with these letters, and translators spent most of the night with the letters, too. We have the other letters translated. This one we just received within two hours. So we haven't had it fully translated.

MS. LUKEY: I have a serious issue with this, your Honor. It's a little bit like springing Dawn Rafferty on us right after Christmas when she turns out to be Linda Bowers' niece, and they've known about her right along. There's nothing that I heard to suggest this is not something they could have determined earlier if they intended to use it. This is truly an ambush. They knew about her sister. That's not new. I don't know what it is they think is new about this. But the fact that they choose to wait until three and a half weeks into a trial and then spring it on us as purported impeachment I find extremely troubling and inconsistent with the rules.

I also have a very strong suspicion that the reason that they made a point with you in our pretrial conference some months ago of saying we don't have to show any impeachment, right, is because they knew exactly what they intended to do.

I don't know what Jola wrote, and it's clear that Dr. Klonoski doesn't know what Jola wrote. I find it very upsetting and extremely inconsistent with the open disclosure rules of current litigation that this would occur. This is the kind of thing that occurred 25 years ago and was the whole reason the Rules of Civil Procedure were adopted. I mean I've built a whole case obviously, and they're suddenly coming in and trying to spring something on me about what the wife supposedly felt. She's dead. I can't ask her.

But I do not feel this is appropriate. I have heard nothing from Mr. Bassett that suggests why he couldn't have come up with this earlier if it was something they intended to use. You don't keep investigating the case when the trial is in process.

MR. BASSETT: Yes, you do.

THE COURT: A lot of people do.

MS. LUKEY: But it's inappropriate.

MR. BASSETT: Based on the type of testimony we got in this case—

MS. LUKEY: What in this case has justified this that you didn't know before?

MR. BASSETT: We couldn't find them, and we found them now, your Honor.

MS. LUKEY: All you had to do was ask for the address.

. . . .

MS. LUKEY: Your Honor, my problem is the method that they've done this.

THE COURT: Your problem is you don't accept that they just knew about it. I do accept that they did just find out as he's represented to me.

MS. LUKEY: It isn't just whether they just knew about it. You're right. I do not believe that they just found out about it. You're absolutely correct.

But quite apart from that is the fact that what one is supposed to do is to do one's discovery and so forth for trial by the discovery disclosure date in order to ensure under the Rules of Civil Procedure, the information you come up with is shared if appropriately requested by the other party. In this case it was not only requested, we had to get a court order. We got the court order regarding all evidence they had on the subject of alleged marital discord.

MR. BASSETT: That was to identify the witnesses.

THE COURT: Take the next step. Then you have all the evidence they had on marital discord.

MS. LUKEY: And, frankly, that evidence doesn't trouble me. Then they come up with this.

THE COURT: That's a different test.

MS. LUKEY: I understand, your Honor. My point is if it were in fact the case that it was okay to send your investigator out while the trial was in progress, what everyone would do in order to avoid the necessity of disclosing materials that are particularly good for ambushing the other side is not do their investigation until the time of trial.

THE COURT: Well, I hear you, but I don't agree with you. You took the initiative to put on the evidence of a good marriage, stable marriage. Everything's hunky-dory and wonderful.

MS. LUKEY: As far as he knew.

THE COURT: Well, as far as he knew. But to the extent that's relevant, I've already—my view, I don't think it's particularly relevant one way or the other. But both of you think it is, and once you do that, they have a right to then challenge whether that was the case. If they just got this and they're going to use it for impeachment, I think they have a right to do it.

. . . .

THE COURT: All right. I'll allow their use, Mr. Bassett. They'll be admissible under Rule 801(d)(2).

MS. LUKEY: Your Honor, there's one other issue that I think—

THE COURT: Not yet.

MS. LUKEY: There is one other issue that I think—I'm a little troubled about here that I would raise to you. This doesn't give me the opportunity to find out from the sister whether there's more to the story, more letters, another side, an explanation, whatever. I mean I cannot imagine, short of paying out large sums of money, what would cause a sister to turn over these letters, which has me a bit troubled, and I would like to know if there is more. I can't do that in the middle of trial. I'm about to close in—you know, ten minutes after he finishes his cross.

So I do remind the Court again, he placed me in an impossible position in that regard because I don't know whether there's more out there, another side to the story or some explanation. Nor do I know whether money has changed hands. I don't know anything. I cannot imagine why a sister would turn these over to be used against her sister's estate.

THE COURT: I'm not sure that's relevant. The only question is are they legitimate documents.

MS. LUKEY: But my ability to examine Marta is essentially nonexistent because of the fact that—

THE COURT: Well, I'm not sure Marta makes a difference.

MS. LUKEY: Well she might make a difference if it turns out that there are other letters, ones that came after, ones

that came before, explanatory letters, phone conversations, none of which I can possibly know. I don't know if this is complete. I don't know if—

THE COURT: Are you asking for a continuance?

MS. LUKEY: No, I'm not asking for a continuance. I'm asking to have these documents excluded, your Honor, on the basis that it's litigation by ambush.

THE COURT: Yeah. That objection has been overruled. All right.

After Dr. Klonoski identified the letters as being in his wife's handwriting, the court held an extended hearing on their admissibility. After considering the arguments of counsel it issued rulings accompanied by comments:

I think these letters pose a substantial risk of unfair prejudice that would outweigh their probative value. I think their probative value, to the extent they have any probative value, lies on the fact of whether or not there was marital discord, whether a divorce was impending, whether she was happy or not in the marriage, why she was unhappy, and the degree of her unhappiness, as expressed in some of these statements, I think might be tangentially relevant. But to present that evidence in this form to the jury poses a very grave risk that they would start to be inflamed or distracted onto issues that aren't relevant in the case; that is, was Jolanta Klonoski a good or bad person? More importantly, was Dr. Klonoski a good or bad person? And factor that into their award, if there is an award, and they shouldn't. I think we all agree they shouldn't be factoring that into their award.

Now, they're probably cumulative anyway, because you put in—in fact, your case seems to be three experts and everybody says there's a bad marriage. So in a sense it's cumulative. So I agree it's better to have words in the decedent's mouth, so I'm willing to cut you some slack in that regard. And despite Attorney Lukey's, I think, well-taken position that these are pretty late in the ball game and she doesn't really have a great opportunity to deal with that, but I'm not going to give

you the ruling, Attorney Lukey. What I'm going to do is give you some relief by limiting the admissibility of these statements to those statements that directly speak about her unhappiness in the marriage, but not in histrionic terms and not in terms that pose a risk of appealing to the passion, prejudice of the jury, and not in terms that pose a risk of putting Dr. Klonoski in such a bad light that that might affect an award in this case. Like I said, I'll give you a chance to rebut, if you can and want to, just as to these statements, but I can't imagine you will want to.

. . . .

In my judgment—well, as I think about it, it's probably an inconsistent view myself, but having read these documents, the four documents you presented, it's my conclusion that—certainly to the extent that you claim anything is relevant in there, most of it is not relevant. Material statements that are made in these documents that might be relevant that seem to portray the former plaintiff, Dr. Klonoski, in a very poor light are not relevant to the issue of Mrs. Klonoski's future hedonic damages. To the extent they are relevant, or one might argue that they are relevant as a predictor or prognostication of her future happiness, I find that those statements, though relevant in that respect, would, nevertheless, be excluded. I do exclude them on grounds that their probative value is far outweighed by the risk of unfair prejudice in that those statements would tend to, in my judgment, distract the jury and confuse the jury and inflame the passions and prejudice of the jury, such that they may be at risk of focusing on the nature of Dr. Klonoski as a person in calculating a damages award for the estate, which we all agree would not be proper.

To the extent—to the limiting [sic] extent it gives a marriage view different than this—than Dr. Klonoski and others portrayed, I think they are relevant. And I think by going through the letters and allowing you to admit those portions of the letters that give that contrary view, without the inflammatory baggage of the other

statements and comments in the letters, I think your interests are fairly protected.

So that's my ruling, I acknowledge that Attorney Lukey makes a very good point about late discovery, not that you've violated my order of disclosure. I find that you've not. And not that you had the document in a—in a timely fashion that you could have delivered them to the plaintiffs in a meaningful timely way. I find you didn't. But she is somewhat at a prejudicial point in that there are other letters that may present a different view altogether of this.

But again, we're at the point where I think we're cumulative anyway on the item of was there discord or not discord in the marriage, and—that's not a very major issue in the case, in any event. So here is what the potentially inconsistent part, I suppose, with respect to all of those other statements in these letters that I have not agreed to allow you to read to the jury or present to the jury. I would—I also exclude those on grounds that, to the extent they are inflammatory but fall below the line of proposing an unfair risk of substantial prejudice, outweighing their probative value, I would exclude them on the additional independent grounds that Attorney Lukey does not have the opportunity to have those other nine letters translated and examined for the possibility that they may have equally praiseworthy and laudatory comments about Dr. Klonoski in them. So who knows. Maybe they would balance them off. So that's just another independent reason why I wouldn't allow the statements to be denigrating of Dr. Klonoski or certainly his relatives into evidence. All right.

The court allowed the following excerpts in evidence. They were read to the jury by the defendants' translator:

Despite the fact that I want to save this marriage very much, I cannot stand being treated as a moron, but that's how Richard likes to behave. I think he will never appreciate me as a person and will always expect from me obedience and approval of anything he proposes. This does not satis-fy me and does not provide even a bit of happiness.

Excerpt from letter of May 20, 1990 (Ex. LLL, RA 4487; RA 3854).

Now I am with him not for myself but for the children and I know that the day will come when we separate because I will not stand being with him to the end of my life.

Excerpt from letter of August 27, 1990 (Ex. LLL, RA 4488; RA 3855).

And I knew that something was wrong. I did not have to wait long because in the evening he came to my bed and graciously informed me that on May 5, 6 and 7 he flies to California, San Diego, for another conference. I could not believe it but he said nobody was going to change his plans. After that last conference I told him I do not want him to ever fly without me.

Excerpts from letter of April 27 and May 1993(Ex. LLL, RA 4489; RA 3856).

As you can see, I think we should get a divorce because we are tormenting each other and no good will come between us. I only pity this yet to be born child because it will never see love between its parents. Sooner or later both I and he will not be able to stand this tension and misery between us any more.

Excerpt from letter of April and May, 1993(Ex. LLL, RA 4489; RA 3856–3857).

Prior to reading the letter excerpts and marking them as exhibits, defendants put on the following witnesses whose testimony we summarize. Joan Conrad worked in the cardiology department and became acquainted with Dr. Klonoski. When she congratulated him on the coming birth of another child, he said: "It wasn't my idea. This wasn't planned." When Conrad asked Dr. Klonoski about his wife, he replied: "She's always complaining, lots of aches and pains. Always complaining about headaches, and I don't pay attention to that anymore." Conrad testified that there was no positive feedback from Dr. Klonoski about his wife.

The next witness was Dr. John Robb, a cardiologist, who worked with Dr. Klonoski. Accompanied by Dr. Klonoski's parents, he met Dr. Klonoski at the Lebanon Airport on his return from the meeting in San Diego,

and drove him to the hospital. Dr. Robb testified that Dr. Klonoski was crying when Dr. Robb picked him up at the airport, that he was "very distraught and upset" and "grieving."

Ellen Fullington was a medical secretary at the Hitchcock Hospital. She worked for Dr. Klonoski as well as other doctors. She testified that Dr. Klonoski's comments about his marriage were negative.

Dr. Douglas H. James was director of the fellowship program at the Hitchcock Hospital. Dr. Klonoski discussed his marriage with him during a review of his performance. Dr. Klonoski felt that his performance was adversely affected by stress at home.

Dawn Rafferty worked with Mrs. Klonoski at the bank. She testified that Mrs. Klonoski was not happy with her marriage. She was considering a divorce, but was afraid that the children would be taken away from her. Mrs. Klonoski complained that her husband was only interested in money. He worked extremely long hours and did not pay attention to her or the children. She wanted to have another child when she became pregnant again. Dr. Klonoski was not happy about her pregnancy. She felt that he wanted her to have an abortion.

The final witness for defendants was the translator who read the letter excerpts to the jury.

Dr. Klonoski was recalled as a rebuttal witness. He testified as follows:

Q. Were you aware before this weekend that your wife had written thoughts of divorce to her family?

A. No, I was not.

Q. Did you have any idea that she felt that way?

A. No, I did not.

Q. When you learned about her feelings, at least as contained at these points in time in these letters, what steps did you take?

A. I was very stunned and distressed that her perception of things was so vastly different from what she represented to me and was distressing her at the same time and that she thought that she could get more answers or more comfort by writing to her family in Poland and not discussing it with me.

When I found that out, I instructed the attorney in Connecticut who is handling the probate of her estate that I waive any right to the proceeds of the estate, and I established an irrevocable trust in the names of our children equally and relinquished all rights to them with the trustee, that is not myself, and that is the trustee's attorney, Jennifer Snyder, from Hale and Dorr in Boston.

Q. And what is your understanding as to whether you now have any claim to the proceeds of the estate?

A. I understand that with the execution of the trust, I have no claim to any of the proceeds in her estate.

Q. One final question, Doctor. We heard testimony on the defense case that you did not want the pregnancy that resulted in Caroline's birth. Is that true?

A. No, that's not true.

On cross-examination there were questions about when the irrevocable trust was established, which were answered ambiguously. There was also a series of questions relative to the testimony by defendants' witnesses.

Dr. Klonoski having withdrawn his own claims, the case went to the jury on only one claim, that of Mrs. Klonoski's estate. The jury returned a defendant's verdict, and the plaintiff appealed.

## II.

### APPLYING THE DISCOVERY RULES

We begin our analysis with a brief review of the pertinent rules of discovery.[3] Rule 26(a)(3)(C) requires each party to disclose to other parties, without awaiting a discovery request, the following information:

(C) an appropriate identification of each document or other exhibit, including summaries of other evidence, separately identifying those which the party expects to

---

**3.** Rule 26(a)(1) does not apply in the District of New Hampshire. *See* Local Rules of the United States District Court for the District of New Hampshire, LR 26.1(a).

·offer and those which the party may offer if the need arises.

Fed.R.Civ.P. 26(a)(3)(C).

This rule requires that: "[u]nless otherwise directed by the court, these disclosures shall be made at least 30 days before trial." *Id.* It is obvious that defendants did not follow the strictures of Rule 26(a)(3)(C) with respect to the letters from Mrs. Klonoski to her sister.

In addition to the mandatory pretrial disclosures, parties may obtain discovery of further matter by various methods. *See* Fed. R.Civ.P. 26(a)(5). Rule 26(b)(1) defines the scope and limits of discovery:

> (b) Discovery Scope and Limits. Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:
>
> (1) In General. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Fed.R.Civ.P. 26(b)(1). Like Rule 26(a)(3)(C), Rule 26(b)(1) provides no exception for documents found during belated investigation that takes place after the trial has begun.[4] On the contrary, the plain language of this Rule 26(b)(1) contemplates wide-ranging discovery to the fullest possible extent.

 Such a broad reading is supported by leading Supreme Court precedent. As the Court stated in *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978), the word "relevant" encompasses

any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case. . . . [D]iscovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues. Nor is discovery limited to the merits of a case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits.

*Id.* at 351, 98 S.Ct. 2380 (citing *Hickman v. Taylor,* 329 U.S. 495, 501, 67 S.Ct. 385, 91 L.Ed. 451 (1947)).

In *Hickman,* the Court characterized the "pre-trial deposition-discovery mechanism established by Rules 26 to 37[as] one of the most significant innovations of the Federal Rules of Civil Procedure." *Hickman,* 329 U.S. at 500, 67 S.Ct. 385. The Court went on to discuss the purpose of the discovery rules:

> Under the prior federal practice, the pretrial functions of notice-giving, issue-formulation and fact-revelation were performed primarily and inadequately by the pleadings. Inquiry into the issues and the facts before trial was narrowly confined and was often cumbersome in method. The new rules, however, restrict the pleadings to the task of general notice-giving and invest the deposition-discovery process with a vital role in the preparation for trial. The various instruments of discovery now serve (1) as a device, along with the pretrial hearing under Rule 16, to narrow and clarify the basic issues between the parties, and (2) as a device for ascertaining the facts, or information as to the existence or whereabouts of facts, relative to those issues. Thus civil trials in the federal courts no longer need be carried on in the dark. The way is now clear, consistent with recognized privileges, for the parties to obtain *the fullest possible knowledge of the issues and facts before trial.*

*Id.* at 500–01, 67 S.Ct. 385 (emphasis added; footnotes omitted). The Court added that the "deposition-discovery rules are to be accorded a broad and liberal treatment." *Id.* at 507, 67 S.Ct. 385. This is because

---

4. The district court has discretion to alter the discovery requirements as appropriate for a given case, if the rules permit and if justice is served thereby. *See* Fed.R.Civ.P. 26(a)(1), 26(a)(3), 26(b).

[m]utual knowledge of all the relevant facts gathered by both parties is essential ·to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession. *The deposition-discovery procedure simply advances the stage at which the disclosure can be compelled from the time of trial to the period preceding it, thus reducing the possibility of surprise.*

*Id.* (emphasis added).

Similarly, in *United States v. Procter & Gamble Co.*, 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958), the Court stated that "[m]odern instruments of discovery serve a useful purpose.... They together with pre-trial procedures make a trial less a game of blindman's bluff and more a fair contest with the basic issues and facts disclosed to the *fullest practicable extent.* Only strong public policies weigh against disclosure." *Id.* at 682, 78 S.Ct. 983 (emphasis added; citation omitted).

 Based on the plain language of Rule 26 and the broad scope that it has been given, it would appear that Mrs. Klonoski's letters fit well within the rule's reach. The letters plainly contain information "reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). As noted, Rule 26 provides no exception for documents found after discovery deadlines have passed.

To the extent the rules contemplate additional material that a party finds after it has provided discovery to the other side, the rules require prompt supplementation of its additional material so the opposing party is not misled by the original discovery responses as the opposing party prepares its case for trial. *See* Fed.R.Civ.P. 26(e). Rule 26(e) provides in pertinent part:

(e) Supplementation of Disclosures and Responses. A party who has made a disclosure under subdivision (a) or responded to a request for discovery with a disclosure or response is under a duty to supplement or correct the disclosure or response to include information thereafter acquired if ordered by the court or in the following circumstances:

(1) A party is under a duty to supplement at appropriate intervals its disclosures under subdivision (a) if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

(2) A party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Fed.R.Civ.P. 26(e). In the instant case, the defendants provided no supplementation of their prior disclosures by adding the letters in question to the list of evidence to be offered at trial.

In 1993, the Federal Rules of Civil Procedure were significantly amended, particularly Rules 26(e) and 37(c)(1). The changes to Rule 26(e) substantially expanded the duty to supplement. Under the pre–1993 version of Rule 26(e), supplementation was required only in a few, limited circumstances. The current version of the rule, as quoted *supra,* imposes a broad requirement on parties to update their earlier disclosures and discovery responses. *See* 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2049.1 (2d ed. 1994 & Supp.1998) ("Wright & Miller"). Thus, even if the defendants could argue that the pre–1993 rule might not have required them to disclose the letters to the plaintiff, they have no such argument under the 1993 amendments to the supplementation requirement.

### IS PRECLUSION THE APPROPRIATE REMEDY?

 The 1993 amendments to the Federal Rules also added Rule 37(c)(1) which provides:

(c) Failure to Disclose; False or Misleading Disclosure; Refusal to Admit.

(1) A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under subparagraphs (A), (B), and (C) of subdivision (b)(2) of this rule and may include informing the jury of the failure to make the disclosure.

Fed.R.Civ.P. 37(c)(1).

Prior to adoption of Rule 37(c)(1), no rule specifically provided sanctions for the failure to supplement discovery. Courts were free to apply their discretion in sanctioning Rule 26(e) violations. The new rule is mandatory: a party that fails to make the required disclosures "shall not, unless such failure is harmless, be permitted to use [undisclosed] evidence at a trial." *Id.* To be sure, the rule somewhat tempers this mandate by permitting courts to excuse failures to disclose to some degree (i.e., to impose other sanctions "in lieu of this sanction"). Fed.R.Civ.P. 37(c)(1). But the new rule clearly contemplates stricter adherence to discovery requirements, and harsher sanctions for breaches of this rule, and the required sanction in the ordinary case is mandatory preclusion.[5]

Even before the 1993 amendments, in *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (per curiam), the Supreme Court stressed the policy reasons for enforcing the discovery rules. The most severe sanctions provided by the rules, the

Court explained, "must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Id.* at 643, 96 S.Ct. 2778. While a warning alone might have made the plaintiffs in that case comply with all future discovery orders, "other parties to other lawsuits would feel freer than we think Rule 37 contemplates they should feel to flout other discovery orders of other district courts." *Id.* Thus, enforcement of discovery rules and orders is necessary, the Court concluded, to prevent abuse by future litigants. *Id.*

It appears, therefore, that the letters in question were covered by the disclosure requirements of Rule 26, including the duty to supplement, and that defendants' failure to disclose them prior to trial precluded defendants from using the letters at trial. The district court did not take this position because it found the letters to fall within an exception to the discovery rules for material that is presented "solely for impeachment purposes." Fed.R.Civ.P. 26(a)(3).

### DO THE LETTERS FALL WITHIN AN EXCEPTION

### TO THE DISCOVERY RULES?

Rule 26(a)(3) provides:

*Pretrial Disclosures.* In addition to the disclosures required in the preceding paragraphs, a party shall provide to other parties [certain delineated] information regarding the evidence that it may present at trial *other than solely for impeachment purposes:* . . . .

Fed.R.Civ.P. 26(a)(3) (emphasis added).

Neither the Rule itself nor the advisory notes define impeachment evidence. The federal cases that have decided whether evidence falls within the impeachment exception

---

5. For this reason, pre–1993 cases analyzing the sanction issue under the pre-amendment rubric retain only limited authority in this post-amendment era. *See, e.g., Freund v. Fleetwood Enters., Inc.,* 956 F.2d 354, 358 (1st Cir.1992) (upholding discretionary sanction of preclusion); *Newell Puerto Rico, Ltd. v. Rubbermaid, Inc.,* 20 F.3d 15, 22 (1st Cir.1994) (upholding discretionary refusal to preclude); *Johnson v. H.K. Webster, Inc.,* 775 F.2d 1, 8 (1st Cir.1985) (requiring a "balancing" of competing interests and requiring "some evasion or concealment, intentional or not, on the part of the litigant offering the evidence").

to the discovery rules are, for the most part, personal injury cases. They frequently deal with two kinds of evidence: video surveillance tapes of a plaintiff's activities subsequent to the injury giving rise to the suit; and information that a defendant has of the plaintiff's prior medical history.[6] Although some district courts have found video surveillance tapes to be "solely" impeachment evidence, *see* Fed.R.Civ.P. 26(a)(3), the weight of authority seems to be that such evidence is both impeaching and substantive and should be disclosed. *See Wegner v. Cliff Viessman, Inc.,* 153 F.R.D. 154, 157–59 (N.D.Iowa 1994).

And this approach makes evidentiary sense. As the Wright and Miller treatise put it, after reviewing the case law:

> If a party plans to testify to one version of the facts, and the opponent has evidence supporting a different version of the facts, the opponent's evidence will tend to impeach the party by contradiction, but if discovery of this kind of evidence is not permitted the discovery rules might as well be repealed. Even those who have been most concerned about protecting impeachment material recognize that substantive evidence must be subject to discovery even though it also tends to contradict evidence of the discovering party.

8 Wright & Miller, *supra,* § 2015, at 212 (footnote omitted).

The only circuit court that directly addresses this subject is *Chiasson v. Zapata Gulf Marine Corp.,* 988 F.2d 513 (5th Cir. 1993). In holding that a video surveillance tape was not "solely" impeachment evidence, the court defined substantive evidence as "that which is offered to establish the truth of a matter to be determined by the trier of fact." *Id.* at 517. It then stated: "Impeach-

ment evidence, on the other hand, is that which is offered to 'discredit a witness . . . to reduce the effectiveness of [her] testimony by bringing forth evidence which explains why the jury should not put faith in [her] . . . testimony.'" *Id.* (alterations in original) (quoting John P. Frank, *Pretrial Conferences and Discovery—Disclosure or Surprise?,* 1965 Ins. Law J. 661, 664 (1965)).

The court recognized that some evidence serves both functions, and, because such evidence is not "solely offered for impeachment," it is not covered by the exception to the Rule 26 discovery requirements. The court held: "Because the tape is, at the very least, in part substantive, it should have been disclosed prior to trial, regardless of its impeachment value." *Id.* at 517–18.[7]

The same is true of the disputed evidence here. The excerpts from the letters written by Mrs. Klonoski to her sister were at least in part substantive, and therefore they did not fall within the "solely for impeachment" exception of Fed.R.Civ.P. 26(a)(3). The letter excerpts constituted substantive evidence because, separate and apart from whether they contradicted Dr. Klonoski's testimony, they tended "to establish the truth of a matter to be determined by the trier of fact." *Chiasson,* 988 F.2d at 518. This is true even though, in addition to their substantive content, the excerpts tended to contradict Dr. Klonoski's testimony regarding the state of his marriage.[8] We hold, therefore, that the district court erred, as a matter of law, in finding the letter excerpts to fall within the exception to the discovery rules for evidence introduced "solely for impeachment purposes" of Fed.R.Civ.P. 26(a)(3).

Nor do we think that Fed.R.Evid. 801(d)(2) opens the evidence door to the ex-

---

**6.** Other cases deal with expert witnesses who change their opinions or theories.

**7.** There is a Seventh Circuit case that can be construed to be contrary to *Chiasson—Debiasio v. Illinois Cent. R.R.,* 52 F.3d 678 (7th Cir.1995). But the ruling in *Debiasio* was highly factspecific and does not govern the present case. In addition, despite its dicta regarding abuse of discretion, *Debiasio* held that the error was harmless, and affirmed the jury verdict. 52 F.3d at 686; *see also supra* at 269 n. 5.

**8.** Nor did this contradiction necessarily mean that Dr. Klonoski was deliberately lying. It is not uncommon for one spouse's view of the marriage to differ from that of the other spouse. Moreover, it is undisputed that Dr. Klonoski was not aware of the letters, prior to being asked to read them on cross-examination at trial. He did not know that letters containing such statements even existed. Perhaps if these had been letters written by Dr. Klonoski himself, they might be deemed "solely for impeachment."

cerpts because they are admissions against a party opponent, as defendants argue. The question is not the admissibility of the excerpts under the Federal Rules of Evidence but whether they were barred because their introduction violated the pretrial discovery orders of the district court and federal discovery rules. The rules of evidence do not trump the discovery rules contained in the Federal Rules of Civil Procedure. The purpose of the discovery rules is to provide for the "fullest possible" pretrial disclosure of admissible evidence, to "reduc[e] the possibility of surprise," *Hickman*, 329 U.S. at 500–01, 67 S.Ct. 385, and to insure "a fair contest," *Procter & Gamble*, 356 U.S. at 682, 78 S.Ct. 983.

■ As we have discussed, *supra*, absent some unusual extenuating circumstances not present here, the appropriate sanction when a party fails to provide certain evidence to the opposing party as required in the discovery rules is preclusion of that evidence from the trial.

We have recently condemned trial by ambush tactics and for this reason vacated a verdict returned for the defendant. *Licciardi v. TIG Ins. Group*, 140 F.3d 357 (1st Cir.1998), centered on the testimony of a medical expert who:

> changed course 180 degrees from his report in his testimony on a key topic at the heart of plaintiff's case. Further, he went into a new area of testimony. There was no prior disclosure of the coming volte face; indeed there was a misrepresentation in the supplemental answer to interrogatories filed two days after the jury was impaneled that the expert's testimony would be the same as in his initial report.

*Id.* at 359 (footnote omitted). We found this "volte face" to be "highly prejudicial to plaintiff's case." *Id.*

We recognize that the focus of *Licciardi* was on the divergence between the pretrial disclosure of the testimony of a party's expert witness and his trial testimony. This court's forthright condemnation of trial by ambush, however, applies to what happened in the case before us.

*Labadie Coal Co. v. Black*, 672 F.2d 92 (D.C.Cir.1982), is factually closer to the situation before us. In *Labadie*, the D.C. Circuit found that the district court's admission of documents was erroneous and prejudicial because plaintiff was not given notice of the documents until after it had rested its case on the last day of trial. The court noted that "when the documents were finally produced, [plaintiff] had little, if any, time effectively to ... cross-examine [defendant] as to their content." *Id.* at 94–95. In the present case, plaintiff was even more prejudiced by the lack of discovery. He had virtually finished presenting his entire case to the jury; Dr. Klonoski's direct testimony had been completed. His depiction of the state of the marriage was very different from the way he would have characterized it if his late wife's letters had been disclosed to him prior to his testifying.

We cannot help being impressed by the exquisite timing of the injection of the letters into the trial. Dr. Klonoski, the last witness in the plaintiff's case, had finished his direct testimony. The plaintiff's case had been completed. Cross-examination started with some innocuous questions. This was followed by what clearly were questions setting up Dr. Klonoski for the introduction of the letters. Whether by design or accident the timing could not have been better for defendants.

■ Policy reasons also militate against the district court's ruling that the letters are exceptions to the discovery rule. If letters or other documents are allowed in evidence after a trial starts for the sole reason that they were not obtained sooner by the party offering them, the rules of discovery and court orders pertaining thereto would become empty phrases signifying nothing. Trial by ambush would be re-born. Enforcement of discovery rules and orders is necessary to prevent abuse by future litigants. *See National Hockey League*, 427 U.S. at 643, 96 S.Ct. 2778.

### THE ADEQUACY OF DEFENDANTS' EXPLANATIONS

■ Defense counsel argued successfully to the district court that the reason the let-

ters had not been disclosed was that counsel had not received them until two days prior to the start of their cross-examination and did not have an opportunity prior to their use at trial to have them translated from Polish to English. This explanation was accepted by the district judge. But it is beside the point. The fact that a party had not actually obtained certain documents before the discovery deadline does not excuse a violation.

The belated appearance of the letters violated the plain meaning and the intent of the discovery rules. It also ignored the specific requirements of the court's pretrial discovery orders.[9] The contents of Mrs. Klonoski's letters were not disclosed prior to trial, as they should have been under the July 16, 1996 discovery order which provided specifically: "defendants shall produce a list of all persons known by them to possess discoverable information related to: (1) marital discord between Dr. and Mrs. Klonoski ... *and* a general description of the nature of that information." The final pretrial order was based on the parties' representations that discovery had been completed and the case was ready for trial.

Nor can the defendants be excused for their failure to comply. That defense counsel did not obtain the letters until two days before their use at trial on cross-examination does not make them admissible. Defendants had been furnished with the address of Mrs. Klonoski's father in Poland more than a full year before trial. Her father and sister lived at the same address. The defendants could, at that time, have undertaken the same investigation that for some unexplained reason did not come to fruition until the trial was near completion. They have offered no legitimate explanation for why they waited as long as they did, knowing that the federal rules and the court had required them to

disclose potential trial exhibits and all relevant responses to discovery requests well before the trial began.[10] This suggests that the defendants may have been, at best, either lax or negligent in pursuing pretrial discovery.

Finally, defense counsel admitted that they at least knew about the letters and the general outlines of their contents two days earlier than they disclosed them, i.e., they knew about them before Dr. Klonoski testified on direct. Counsel could have put plaintiff on notice that certain new and hitherto undisclosed evidence was on the verge of becoming available on the issue of marital discord. If such notice had been given at that point, prior to Dr. Klonoski's testimony on direct, then undoubtedly his testimony would have been different and the present problem would most likely never have arisen.

## THE DISTRICT COURT'S RULING

After reading the district court's rulings and comments, we have difficulty understanding the basis of its decision to allow excerpts from the letters to be read to the jury. The first paragraph of the court's order states: "I think these letters pose a substantial risk of unfair prejudice that would outweigh their probative value." Despite this pronouncement, the court admitted excerpts from the letters into evidence. With due respect, we do not think that the prejudice was reduced appreciably by limiting the court's ruling to the excerpts read to the jury. In fact, by shortening lengthy letters and allowing into evidence only the inflammatory portions, their prejudicial impact was probably heightened.

We are also puzzled by the statement: "I acknowledge that Attorney Lukey makes a very good point about late discovery, not that

---

**9.** We are aware, of course, that the district court found that the letters did not violate its pretrial discovery orders. We assume, absent any explanation from the district court as to its reasoning, that this conclusion was based on the court's incorrect ruling that the letters were excepted from discovery under the "solely for impeachment" provision of Fed.R.Civ.P. 26(a)(3). *See infra* at 273.

**10.** Indeed, in the side bar conference when the letters were first disclosed during Dr. Klonoski's

cross-examination, defense counsel represented to the court that counsel had "just got[ten the first letter] last night *based on the testimony that we had heard in this case,* and it's legitimate cross-examination." (Emphasis added.) Later discussion made it clear that defendants' dispatching their investigators to Poland had nothing to do with any "testimony that [they] had heard in [the] case."

you've violated my order of disclosure. I find that you've not." The only basis for this finding was that the court believed the letter fell within the impeachment exception provisions of Fed.R.Civ.P. 26(a)(3). We have found, *supra*, that the exception does not apply. Clearly the introduction of the letters without prior notice to plaintiff violated the pretrial discovery order of July 19 and the final pretrial order.

We agree with the court's statement that Attorney Lukey "is somewhat at a prejudicial point in that there are other letters that may present a different view altogether of this." We believe this greatly understated the predicament in which plaintiff's attorney found herself. First, Attorney Lukey was correct that, because of the defendants' failure to provide these letters during the discovery process, plaintiff's counsel was unable to conduct her own investigation which might uncover other letters from Mrs. Klonoski explaining what she wrote in the letters introduced by defendants, or which might demonstrate that Mrs. Klonoski's anger was a passing feeling that did not reflect her overall view of the marriage. But more critically, plaintiff had already planned and executed his trial strategy based on the evidence available to the parties through discovery. He had presented his entire case, including the direct examination of his lead witness. To spring these letters—hitherto unknown by plaintiff and his attorneys— upon the plaintiff at that stage of the litigation was a lot more than "somewhat ... prejudicial." Realistically, it was devastating to his ability to succeed with the jury.

### A CONTINUANCE AS A POSSIBLE REMEDY

■ The district court asked plaintiff's counsel at least twice if she wanted a continuance. She said she did not want one because she did not think it would do any good. It is true, as defendants argue, that in some cases we have found that surprise evidence could be combated by granting a continuance to the surprised party. *See Newell Puerto Rico, Ltd. v. Rubbermaid, Inc.,* 20 F.3d 15, 22 (1st Cir.1994). In *Licciardi* we discussed at length the effectiveness of a continuance

as an antidote to surprise evidence. 140 F.3d at 366–67. As we stated there:

> It is true that, where effective to counteract the surprise to one party wrought by the other party's failure to abide by Rule 26, a continuance or the calling of a rebuttal witness is preferable to terminating the trial and beginning anew. However, a continuance is not effective in every circumstance to counteract the unfair surprise. *See Thibeault [v. Square D Co.],* 960 F.2d [239,] 246 [ (1st Cir.1992) ] ("[A] continuance is often ineffectual as a sanction and unfair to both the court and the opposing party.").

*Licciardi,* 140 F.3d at 366. We found no practical way for the plaintiff to remedy the surprise; any solution would have prejudiced the plaintiff even more. *Id.* at 366. We thought it important to consider the policy behind the discovery rules. Directly contrary to this policy, granting a continuance, we found, would create greater incentives for attorneys to violate Rule 26(e). *Id.; see also National Hockey League,* 427 U.S. at 643, 96 S.Ct. 2778 (Strict sanctions are necessary "to deter those who might be tempted to such conduct in the absence of such a deterrent."). "Such conduct should not be rewarded." *Licciardi,* 140 F.3d at 367. And as we also noted in *Thibeault:* "If continuances were granted as a matter of course for violations of Rule 26(e), the rule could always be disregarded with impunity." *Thibeault,* 960 F.2d at 246; *see also Freund,* 956 F.2d at 359.

We think this rationale applies with equal force to the instant case. We fail to see how a continuance could have accomplished anything in this case. As plaintiff's counsel pointed out orally at the hearing on the admissibility of the letters, the only thing she could have done was to take the deposition of Dr. Klonoski's sister-in-law to find out as much as she could about the letters. Because of the distances involved and the language problems, this would have necessitated a lengthy continuance. A continuance was not a practical alternative.

Moreover, short of a new trial, a continuance would have accomplished nothing at all to mitigate the prejudice caused to plaintiff's case by defendants' having waited until *after*

Dr. Klonoski had finished his direct testimony before disclosing the letters to the plaintiff. As noted *supra*, defense counsel knew about the letters prior to Dr. Klonoski's testimony. If counsel had notified the plaintiff at that point, then perhaps a continuance might have been the appropriate remedy.

A continuance would have been an inadequate remedy in this case also because of the policy concerns regarding incentives for parties to comply with discovery rules. *See National Hockey League*, 427 U.S. at 643, 96 S.Ct. 2778 (Absent strict sanctions, "other parties to other lawsuits would feel freer than we think Rule 37 contemplates they should feel to flout other discovery orders of other district courts."). As plaintiff's counsel told the district court, if we were to condone the procedure followed by the defendants in this case, then "what everyone would do in order to avoid the necessity of disclosing materials that are particularly good for ambushing the other side is not do their investigation until the time of trial."

### *IS A NEW TRIAL REQUIRED?*

 Finally, the defendants argue that, even if the district court erred by admitting the letter excerpts into evidence and allowing the defendants to use them in cross-examining Dr. Klonoski, a new trial is not warranted because the letter excerpts could have had no effect on the jury's verdict of no liability. Their contention can be summarized as follows. In his jury instructions, the district court judge told the jury to consider the letter excerpts only in its determination of hedonic damages. Because the jury found that the defendants were not liable, it never reached the damages issue. Therefore, the admission of the letter excerpts were, at the most, harmless error.

This argument has surface appeal but we reject it. We note that the cases cited by defendants in support of their position are not cases involving the breach of discovery orders and the discovery rules. Defendants' precedential support consists of cases that focus on the judge's instructions after the admission or exclusion of evidence. *See Navarro de Cosme v. Hospital Pavia*, 922 F.2d 926 (1st Cir.1991).

Where there has been, as there was here, an egregious breach of discovery orders and the discovery rules, we think that the controlling case is *Anderson v. Cryovac, Inc.*, 862 F.2d 910 (1st Cir.1988). The plaintiffs in *Anderson* sued for personal injuries allegedly sustained because of toxic contamination to water wells. The jury found that the defendants were not responsible for the pollution. Shortly after the trial, the plaintiffs learned that the defendants had failed to disclose a groundwater study during pretrial discovery. *Id.* at 922. The plaintiffs moved to set aside the judgment under Fed.R.Civ.P. 60(b). *Id.* at 923. The district court denied the motion because the "plaintiffs had not been prevented from fully and fairly presenting their case." *Id.*

We reviewed the district court's ruling for abuse of discretion. We noted that under Fed.R.Civ.P. 60(b), "the court may relieve a party ... from a final judgment, order, or proceeding for ... (3) fraud ... (4) misrepresentation, or other *misconduct* of an adverse party." Fed.R.Civ.P. 60(b) (emphasis added). We held that the "[f]ailure to disclose or produce materials requested in discovery can constitute 'misconduct' within the purview of this subsection." *Anderson* at 923 (citing *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir.1978)).

We defined misconduct as follows:
"Misconduct" does not demand proof of nefarious intent or purpose as a prerequisite to redress. For the term to have meaning in the Rule 60(b)(3) context, it must differ from both "fraud" and "misrepresentation." Definition of this difference requires us to take an expansive view of "misconduct." The term can cover even accidental omissions—elsewise it would be pleonastic, because "fraud" and "misrepresentation" would likely subsume it. *Cf. United States v. One Douglas A–26B Aircraft*, 662 F.2d 1372, 1374–75 n. 6 (11th Cir.1981) (to avoid redundancy, "misrepresentation" in Rule 60(b)(3) must encompass more than false statements made with intent to deceive). We think such a construction not overly harsh; it takes scant imagination to conjure up discovery responses which, though made in good faith,

are so ineptly researched or lackadaisical that they deny the opposing party a fair trial. Accidents—at least avoidable ones—should not be immune from the reach of the rule. Thus, we find ourselves in agreement with the Fifth Circuit that, depending upon the circumstances, relief on the ground of misconduct may be justified "whether there was evil, innocent or careless, purpose." *Bros Inc. v. W.E. Grace Mfg. Co.,* 351 F.2d 208, 211 (5th Cir.1965), *cert. denied,* 383 U.S. 936, 86 S.Ct. 1065, 15 L.Ed.2d 852 (1966).

*Id.* at 923.

*Anderson* holds that any "uncertainties attending the application of hindsight in this area" should favor the party that was denied discovery because "parties ought not to benefit from their own mis–, mal–, or nonfeasance." 862 F.2d at 924.

We concluded:

> To summarize, in motions for a new trial under the misconduct prong of Rule 60(b)(3), the movant must show the opponent's misconduct by clear and convincing evidence. Next, the moving party must show that the misconduct substantially interfered with its ability fully and fairly to prepare for, and proceed at, trial. This burden may be shouldered either by establishing the material's likely worth as trial evidence or by elucidating its value as a tool for obtaining meaningful discovery. The burden can also be met by presumption or inference, if the movant can successfully demonstrate that the misconduct was knowing or deliberate. Once a presumption of substantial interference arises, it can alone carry the day, unless defeated by a clear and convincing demonstration that the consequences of the misconduct were nugacious. *Alternatively, if unaided by a presumption—that is, if the movant is unable to prove that the misconduct was knowing or deliberate—it may still prevail as long as it proves by a preponderance of the evidence that the nondisclosure worked some substantial interference with the full and fair preparation or presentation of the case.*

*Id.* at 926 (emphasis added).

We think this case falls well within the parameters of *Anderson.* As already noted,

there was, intentional or otherwise, an egregious breach of the discovery orders and the discovery rules which resulted in "substantial interference with the full and fair preparation" of plaintiff's case. We cannot know with certainty what impact the letter excerpts had on the jury, but to dismiss what happened as harmless error would render the discovery rules and orders issued thereunder useless. Moreover, where, as in this case, undisclosed evidence is introduced at a key point in the trial, it would be unrealistic to say that it had no effect on the jury's determination as to liability. If the jury decided that Dr. Klonoski was a tyrant as a husband and a liar, his chances of obtaining a favorable and fair verdict were destroyed. We find that the district court erred as a matter of law in allowing the letter excerpts into evidence and, as in *Anderson,* abused its discretion in not granting plaintiff's motion for a new trial.

In *Perez–Perez v. Popular Leasing Rental, Inc.,* 993 F.2d 281 (1st Cir.1993), we applied the *Anderson* misconduct test to a Fed. R.Civ.P. 59 motion for a new trial. Here, the plaintiff sought damages for emotional distress sustained because of her sister's death. She alleged that one defendant drove into the sister while she was walking on the side of the road. During the trial, the plaintiff used a previously-undisclosed expert witness. *Id.* at 286. Prior to trial, the plaintiff never suggested that the defendant's eyesight was at issue. *Id.* During the defendant's direct examination, his lawyer noted he wore glasses and asked one question about them. *Id.* The plaintiff's lawyer focused on the defendant's eyesight during cross-examination. *Id.* Following this testimony, the plaintiff's lawyer sought to introduce an eye doctor as a "rebuttal witness." *Id.* Despite contacting the doctor four months prior to trial, the plaintiff's lawyer never listed the doctor as a potential witness. *Id.*

In its decision to allow the doctor to testify, the district court stated that "there was 'no excuse as to why [counsel] kept [Dr. Kleis' testimony] under [his] sleeve until this moment;' and ... the proffered testimony changed the theory of the case." *Id.* at 287

(alterations in original). Noting, however, that this misconduct was not the plaintiff's fault, but rather her counsel's, the district court admitted the testimony as an "act of justice." *Id.*

We found that this decision was an abuse of discretion. In response to the district court's "act of justice" reason for admitting the evidence, we stated that the court

> is aware of the difficulty of excluding highly relevant and perhaps dispositive testimony which apparent substantive justice requires should be considered by the jury. Apparent substantive justice may be illusory, however, if the purportedly dispositive evidence is not subject to a fair testing in an even-handed process.

*Id.* at 287 n. 4. Applying the analysis of Fed.R.Civ.P. 59(a) used in *Conway v. Chemical Leaman Tank Lines, Inc.*, 687 F.2d 108, 111–12 (5th Cir.1982), the *Perez–Perez* panel found that the undisclosed eye doctor "exactly comports with" the Fifth Circuit's definition of "unfair surprise" and prejudiced the defendants' case.[11] *Id.* at 287. Because the doctor's testimony introduced a "novel theory of liability," defense counsel could not "design an intelligent litigation strategy to address the charge of visual impairment and . . . effectively cross-examine [him]." *Id.* In addition, we found that the criteria for "misconduct" set forth in *Anderson* "apply equally to this motion under Rule 59." *Id.* at 288. The same reasoning applies to the case before us. We conclude that the district court's error in admitting Mrs. Klonoski's letters was prejudicial, not harmless.

## CONCLUSION

We find that the district court abused its discretion in allowing the excerpts from the letters in evidence. There was a clear violation of the court's pretrial discovery orders and the requirements of the discovery rules. It follows that the court also abused its discretion in denying plaintiff's motion for a new trial.

11. In *Conway*, the Fifth Circuit affirmed the grant of a new trial under Rule 59(a), because the plaintiff had "been unfairly made the victim of surprise," in that the defendant had called a previously undisclosed expert witness. 687 F.2d at 109–11. The appeals court rejected the defendant's argument that the proper remedy was a continuance.

■ In fairness to the district court, we must explain that our findings of abuse of discretion were not based on any arbitrary refusal by the court to require compliance with its pretrial orders and the discovery rules. Rather, the court's findings stemmed from its legally incorrect ruling that the letters fell within the impeachment exception of Fed.R.Civ.P. 26(a)(3). This does not mean that there was no abuse of discretion. As the Supreme Court has stated, "[a] district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 94–102, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *see United States v. Marroquin*, 136 F.3d 220, 223 (1st Cir.1998); *Golas v. HomeView, Inc.*, 106 F.3d 1, 3 (1st Cir.1997).

*We vacate the judgment below and remand for a new trial. Costs on appeal awarded to appellant.*