# United States Court of Appeals
## For the First Circuit

No. 09-2284

DAVID HARRIMAN,

Plaintiff, Appellant,

v.

HANCOCK COUNTY, a Political Subdivision of the State of Maine;
WILLIAM CLARK, in his Personal and Professional Capacities as
Sheriff of Hancock County Sheriff Department; RYAN HAINES, in his
Personal and Professional Capacities as Corrections Officer of
Hancock County Sheriff Department; HEATHER SULLIVAN;
MICHAEL PILESKI, in his Personal and Professional Capacities as
Corrections Officer of Hancock County Sheriff Department;
KAREN MCCARTY, in her Personal and Professional Capacities as
Corrections Officer of Hancock County Sheriff Department;
TROY RICHARDSON, in his Personal and Professional Capacities
as Corrections Officer of Hancock County Sheriff Department,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr, Chief U.S. District Judge]

Before

Torruella, Selya and Howard,
Circuit Judges.

Dale F. Thistle, with whom Law Office of Dale F. Thistle was
on brief, for appellant.
Peter T. Marchesi, with whom Cassandra S. Shaffer and
Wheeler & Arey, P.A. were on brief, for appellees.

December 6, 2010

**HOWARD, Circuit Judge.** This civil rights action involves competing accounts of an arrestee's weekend stay in Maine's Hancock County Jail. Plaintiff David Harriman, although he remembers virtually nothing that occurred over the entire weekend, contends that one or more correctional officers beat him until he sustained a lasting brain injury. Defendants Hancock County, its sheriff and several correctional officers assert that Harriman fell on his head. Harriman appeals the district court's preclusion of two affidavits and entry of summary judgment in defendants' favor. After careful review, we affirm.

## I. BACKGROUND

We recount the facts in the light most favorable to Harriman as the party opposing summary judgment. Statchen v. Palmer, 623 F.3d 15, 16 (1st Cir. 2010).

### A. The Weekend

On a Friday evening in October 2006, Maine State Trooper Gregory Mitchell responded to a disturbance at the Blue Hill Hospital involving a disorderly emergency room patient later identified as Harriman. After a short game of cat-and-mouse -- Harriman fled the hospital on foot before Mitchell arrived but returned on account of foul weather -- Mitchell found Harriman back in the emergency room. Harriman appeared to be drunk.[1] Because

---

[1]A blood test later revealed that Harriman's blood alcohol content was at least .3 percent.

Harriman was prohibited from consuming alcohol in connection with a previous infraction, Mitchell arrested him.[2]

Mitchell escorted Harriman outside to the police cruiser and searched him. Harriman launched a stream of epithets against Mitchell, including threats to Mitchell and his children. As Mitchell guided Harriman into the cruiser, Harriman resisted and fell to the ground, pulling Mitchell down with him. Mitchell got back on his feet and hoisted Harriman up and into the cruiser.[3] Once in the cruiser, Harriman spit at Mitchell and then fell asleep.

At about 8 p.m., the pair arrived at the jail. Mitchell escorted Harriman into the intoxilyzer room.[4] Harriman leveled several new expletives against Mitchell, and struggled against Mitchell's hold until correctional officers Ryan Haines and Michael Pileski arrived to take custody. Mitchell then went to the

_____

[2]The record does not describe Harriman's criminal history, but this is of no moment because Harriman no longer contests his arrest. See infra note 6.

[3]The record contains a vague reference that Mitchell struck Harriman in order to get him into the police cruiser. We need not dwell on that because Harriman does not assert that his injuries occurred before his detention at the jail. And Mitchell, although initially named as a defendant, was subsequently dropped from the case by mutual agreement of the parties.

[4]An intoxilyzer room is a room that contains, among other things, an intoxilyzer -- a portmanteau of "intoxication" and "analyzer" -- which is a device used to estimate blood alcohol content by means of infrared spectroscopy.

adjacent booking room to complete the necessary paperwork regarding the evening's events.

What happened next is the subject of some dispute. According to the defendants, Haines and Pileski escorted Harriman directly to the nurse's station where Haines asked him several questions in order to evaluate whether he was a suicide risk. Harriman did not respond. In accordance with jail protocol, Harriman was determined to be a suicide risk until he could respond in a manner that showed otherwise. With some assistance from Haines, Harriman changed into an anti-suicide smock.[5] At about 8:30 p.m., Haines and Pileski moved Harriman to HD-1, which is a holding cell further inside the jail and adjacent to the jail's control room. Correctional officers began monitoring Harriman at successive fifteen-minute intervals. Harriman then lay down and went to sleep.

A little after 10 p.m., Sergeant Heather Sullivan, from her position in or around the control room, heard Harriman "yelling" and "hollering" in his cell. When Sullivan looked over, she saw Harriman "banging around" his cell naked; she also noticed blood on the bridge of his nose. Sullivan radioed Haines and instructed him to investigate. Harriman greeted Haines with shouted expletives and, from behind the glass partition, drew his

---

[5]An anti-suicide smock is a stiff, tear-resistant gown worn in place of clothing to prevent a detainee from forming a noose or other device that could be used to commit suicide.

-4-

fist back as though he would punch Haines.  Sullivan soon arrived outside Harriman's cell.  While she and Haines were deciding on a course of action, they both heard a loud "thump" or "thud" from inside Harriman's cell.  Although neither Sullivan nor Haines saw what happened in Harriman's cell, Pileski and another correctional officer, Crystal Hobbs, from their vantage point in the control room, saw Harriman fall to the floor in a leftward motion.  Pileski further saw Harriman strike his head as he fell against the lefthand concrete wall of his cell.

Haines entered the cell and saw Harriman lying on the floor in his own urine, apparently unconscious.  Harriman then had what appeared to be two seizures, each lasting a matter of seconds.  At Sullivan's request, Hobbs called an ambulance from the control room at about 10:20 p.m.  The ambulance arrived within several minutes and took Harriman to the hospital.  Haines accompanied Harriman in the ambulance and stayed with him at the hospital until relieved by another correctional officer later that evening.

Harriman remembers next to nothing about his jail stay.  From his arrest on Friday until he woke up at home on Monday or Tuesday night, Harriman remembers only the following:  "a lot of hollering"; "echoes from hollering"; "flashes of light"; "somebody saying he's had enough or I think that's enough or maybe even that's enough"; "seeing my wife's cousin [Foster Kane, another jail detainee] but just barely"; "somebody telling me that they were

going to take me to Augusta"; and "the smell . . . [of] urine mixed with cleaning fluid."

Given his anamnestic difficulties, Harriman relies on Mitchell's deposition testimony and affidavits from two other witnesses to contradict the defendants' version of events.

Mitchell testified at deposition that he spent roughly an hour in the booking room finishing up paperwork after transferring custody of Harriman to Haines and Pileski. When Mitchell exited the booking room at about 9 p.m., he noticed Harriman through a glass partition in a room known as secure holding, not in HD-1, which was further inside the jail. According to Mitchell, Harriman appeared to be unaccompanied and was wearing civilian clothes.

Foster Kane, the detainee who Harriman vaguely remembers seeing, stated in an affidavit that, from his cell near the booking room, he "heard yelling and screaming and loud thuds of someone hitting a wall." He further stated that the "commotion went on for approximately 45 minutes before I saw the correctional officers dragging David Harriman into my cell block." And, "David had two black eyes, a cut on his nose, and a cut on his forehead over his right eye."

Jenny Sheriff, the emergency medical technician who responded to the jail's call for an ambulance, stated in an affidavit that she "picked Mr. Harriman up in [secure holding]." Sheriff noticed dried blood on Harriman's nose, and was "certain

that I did not receive the call to respond to the Jail immediately after the injuries occurred." She also stated that Harriman was naked and that there was "no robe or suicide smock in his cell."

The rest of the weekend is materially undisputed. Harriman returned from the hospital early Saturday morning. He spent the next two days in jail. On Monday, he appeared before a judge who set bail. Later that day, a family member bailed him out and drove him home. The next thing Harriman remembers is waking up at home on Monday or Tuesday night.

B. **The Lawsuit**

In April 2008, Harriman brought a civil rights action against the defendants in federal district court in Maine. He asserted five claims premised on constitutional violations (excessive force, false arrest, conspiracy under both §§ 1983 and 1985, and deprivation of due process) and three claims premised on state tort law (negligence, intentional infliction of emotional distress, and punitive damages). In due course, the magistrate judge assigned to the case entered a scheduling order setting dates for, among other things, initial disclosures (July 30, 2008) and close of discovery (December 3, 2008). An amended scheduling order required dispositive motions by January 15, 2009. Trial, if necessary, was anticipated for April 2009.

Harriman's initial disclosure identified fourteen individuals likely to have discoverable information; critically,

however, it did not identify either Kane or Sheriff.  See Fed. R. Civ. P. 26(a)(1)(A)(i) (requiring identification of individuals "likely to have discoverable information").  Discovery proceeded over the next several months, during which the parties exchanged written discovery and deposed almost all individuals that Harriman had identified in his initial disclosure.

On January 15, 2009, the defendants moved for summary judgment.  On February 17, 2009, two days before Harriman's response to the defendants' motion was due and more than two months after discovery had closed, Harriman's attorney sent the defendants a "supplemental" initial disclosure that identified Kane and Sheriff as two additional individuals likely to have discoverable information.  In a cover letter to the amended disclosure, Harriman's attorney explained that he had retained a private investigator, that the investigator had located Kane and Sheriff, and that Harriman intended to submit affidavits from Kane and Sheriff in opposition to summary judgment.  On February 19, 2009, Harriman filed his opposition papers, which drew heavily from the Kane and Sheriff affidavits in contesting the defendants' motion.

In their reply, the defendants requested that the magistrate judge strike these affidavits as a sanction pursuant to Fed. R. Civ. P. 37(c)(1).  The magistrate judge held a telephone conference with counsel to discuss this request.  Following the conference, which was not transcribed, Harriman submitted a

-8-

memorandum and supporting affidavits addressing the failure to identify Kane and Sheriff earlier. Those affidavits revealed that Harriman's attorney had not retained the investigator until January 5, 2009, ten days before the defendants' summary judgment motion was due and more than a month after the close of discovery.

The magistrate judge issued an order that precluded the Kane and Sheriff affidavits as a sanction, and recommended summary judgment in favor of the defendants on all remaining claims.[6] The magistrate judge reasoned that Harriman offered "precious little justification or explanation for his own failure to properly prepare his case and complete discovery in a timely fashion," and that preclusion was necessary "if the court's scheduling orders are to maintain any credibility at all." Nevertheless, the magistrate judge stated that summary judgment was appropriate even if one considered the Kane and Sheriff affidavits, and so purported to analyze Harriman's claims under the full record. When the magistrate judge analyzed Harriman's excessive force claim, however, she disregarded the Kane affidavit on the basis of her earlier decision precluding that affidavit:

> Clearly if Harriman has met his burden of creating a genuine dispute of material fact on his theory that he was deliberately beaten by the guards by providing competent evidence of his theory, a trial would be necessary on this count. However, I have determined that the Kane Affidavit must be stricken because Harriman has

---

[6]Harriman dropped his claims for false arrest and conspiracy under § 1985 in his response to the summary judgment motion.

in no way demonstrated a justification for his late disclosure (and tardy efforts to investigate). The Sheriff Affidavit also is stricken, but even if it were not, this evidence would not be sufficient to carry Harriman's burden of providing a dispute of fact that justifies sending this count to trial.

(Emphasis in original.) The district court adopted in full the magistrate judge's report and recommendation and entered judgment.

## II.  DISCUSSION

We address two threshold issues before reaching the propriety of summary judgment.

### A.    Which Claims Harriman Preserved For Appeal

The defendants argue that Harriman has waived all claims, save his claims for excessive force and municipal liability, because he failed to address any other claims in his opening brief. They further argue that those claims (again, except his claims for excessive force and municipal liability) are doubly waived because Harriman failed to object to the portions of the magistrate judge's order concerning those claims. Harriman contests waiver on the ground that our standard of review in this case is de novo. According to Harriman, that standard requires us to review all his claims, regardless of whether he articulated them in his brief.

Harriman correctly identifies the standard of review, but that is about all. A long-familiar rule in this circuit is that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). "It is not

-10-

enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." Id. Instead, "a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace." Id. (quoting Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988)). Contrary to Harriman's postulation, plenary review does not excuse that obligation.

If Harriman intended to attack summary judgment with respect to each and every claim, his opening appellate brief is woefully deficient. His brief challenges summary judgment only as to his claims of excessive force and municipal liability. It does not explain why summary judgment on his other claims was improper; indeed, it does not even mention those claims other than to list them in the statement of the case. Although Harriman's reply brief contains references to those claims, it too fails to articulate a reason for vacating summary judgment as to those claims. And even if it had, the time for doing so had passed. See Braintree Labs., Inc. v. Citigroup Global Mkts. Inc., 622 F.3d 36, 44 (1st Cir. 2010) ("The slight development in the reply brief does nothing to help matters, as arguments raised there for the first time come too late to be preserved on appeal.").

Consequently, only Harriman's excessive-force and municipal-liability claims are properly before us. All other claims are waived.[7]

## B.    **Preclusion of the Kane and Sheriff Affidavits**

Harriman challenges the magistrate judge's decision precluding the Kane and Sheriff affidavits. Because that ruling defined the record on which summary judgment rests, we address this challenge before turning to the merits. Livick v. Gillette Co., 524 F.3d 24, 28 (1st Cir. 2008).

Harriman argues, essentially, that precluding the affidavits was wrong because they were important to his case. The defendants counter that preclusion was a proportional response to Harriman's failure to identify Kane and Sheriff earlier. Each individual, the defendants contend, could have been identified in the exercise of reasonable diligence during discovery, and Harriman's failure to do so prejudiced the defendants because they sought discovery and moved for summary judgment without knowing about two prospective witnesses on whom Harriman later relied.

---

[7]Although we need not address the defendants' alternate argument concerning Harriman's incomplete objection below, we note that a party's failure to object adequately to a magistrate judge's report and recommendation imperils that party's ability to cry foul on appeal. See, e.g., Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010) ("We have previously held that 'only those issues fairly raised by the objections to the magistrate's report are subject to review in the district court and those not preserved by such objection[s] are precluded on appeal.'") (quoting Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988)).

We begin our inquiry with the Federal Rules of Civil Procedure, which provide the basic framework. Rule 26 requires a party, without awaiting a discovery request, to "provide to the other parties . . . the name . . . of each individual likely to have discoverable information -- along with the subjects of that information -- that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). That obligation is a continuing one. See Fed. R. Civ. P. 26(e)(1)(A) (requiring a party to supplement its disclosure promptly "if the party learns that in some material respect the disclosure or response is incomplete or incorrect.").

Failure to comply with disclosure obligations can have severe consequences. Rule 37 authorizes district courts to sanction noncomplying parties; although sanctions can vary depending on the circumstances, "[t]he baseline rule is that 'the required sanction in the ordinary case is mandatory preclusion.'" Santiago-Diaz v. Laboratorio Clinico Y De Referencia Del Este, 456 F.3d 272, 276 (1st Cir. 2006) (quoting Lohnes v. Level 3 Commc'ns, Inc., 272 F.3d 49, 60 (1st Cir. 2001)); see Fed. R. Civ. P. 37(c)(1) (providing that if a party fails to disclose under Rule 26, that "party is not allowed to use that information or witness to supply evidence on a motion").

We consult an array of factors when reviewing preclusion decisions. They include the sanctioned party's justification for

-13-

the late disclosure; the opponent-party's ability to overcome its adverse effects (i.e., harmlessness); the history of the litigation; the late disclosure's impact on the district court's docket; and the sanctioned party's need for the precluded evidence. Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 76 (1st Cir. 2009) (citing Macaulay v. Anas, 321 F.3d 45, 51 (1st Cir. 2003)); see also Santiago-Diaz, 456 F.3d at 276-77. Our review is highly deferential, Gagnon v. Teledyne Princeton, Inc., 437 F.3d 188, 191 (1st Cir. 2006); see Macaulay, 321 F.3d at 51 ("the question on appeal is not whether we would have imposed the same sanction. Rather, the question is whether the district court's action was so wide of the mark as to constitute an abuse of discretion."), and the sanctioned party shoulders a "heavy burden" to show that an abuse has occurred. Santiago-Diaz, 456 F.3d at 275; see also Wilson v. Bradlees of New England, Inc., 250 F.3d 10, 21 (1st Cir. 2001) (sanctioned party obliged to show preclusion unwarranted).

Our examination of these factors leads us to conclude that preclusion of the affidavits fell within the parameters of the district court's discretion.

Harriman's justification for the late disclosure is nonexistent. He argues on appeal that "had Defendants written truthful reports, or testified truthfully in deposition, Plaintiff would have learned far earlier that Plaintiff was kept in the Secure Holding Cell throughout the evening on October 20, 2006."

-14-

He argued, similarly, before the magistrate judge that he was "lulled into the belief that there was no one to corroborate Trooper Gregory Mitchell's version of the facts, which stood in stark contrast to those of the Defendants." But these statements only pound the table. They do not explain, let alone justify, Harriman's late disclosure or his decision to begin looking for Kane and Sheriff in earnest only after discovery closed. Cf. Klonoski v. Mahlab, 156 F.3d 255, 269 (1st Cir. 1998) (requiring preclusion in roughly comparable circumstances involving a failure to conduct an adequate investigation), superceded in unrelated part by rule amendment, In re Subpoena to Witzel, 531 F.3d 113, 118 (1st Cir. 2008).

The record shows beyond hope of contradiction that Harriman knew very early on that Kane and Sheriff could help his case. As early as 2006, Harriman knew that Kane was in jail with him over the weekend. It is one of the few fragments of information that Harriman remembered, and Kane's name appeared on an inmate list that the defendants produced during discovery. Harriman also knew, as early as 2007, that Kane had information that supported his claims. Coincidentally, Kane is the first cousin of Harriman's spouse. Kane wrote a letter to Harriman's spouse in April 2007 -- before this case even commenced -- stating "that he believed David [Harriman] had been beaten by corrections officers at the Hancock County Jail on October 20, 2006." Despite

-15-

knowing Kane's importance to his case, Harriman made no meaningful attempt to find him until after discovery closed.

So, too, with Sheriff. Harriman may not have remembered Sheriff, but multiple witnesses testified at their depositions that an EMT responded to the jail and brought Harriman to the hospital in an ambulance. The defendants also produced the ambulance's so-called run report.[8] Among other things, the run report described the circumstances surrounding the call and Harriman's condition when Sheriff arrived. True, the run report did not reveal Sheriff's identity: in what appears to be a photocopying error, the bottom of the page cuts off after asking for the "SIGNATURE OF CREW MEMBER IN CHARGE" (i.e., Sheriff). But the salient point is that Harriman knew during discovery that an EMT existed who had information that could support his claims, and yet he did nothing whatsoever to find that individual until after discovery closed.

As for the next factor, Harriman's late disclosure was not a harmless inconvenience. The defendants prepared and filed a summary judgment motion premised on evidence submitted before the discovery deadline. Harriman opposed the motion with affidavits obtained after that deadline, from witnesses whom he had not provided the defendants an opportunity to depose. While perhaps

---

[8]Counsel for the defendants explained at oral argument that the jail had a copy of the run report because Harriman returned from the hospital with that document and other medical records in order to facilitate further medical care by jail staff.

not as palpable as if trial were looming, the prejudice to defendants was real.  See, e.g., Primus v. United States, 389 F.3d 231, 236 (1st Cir. 2004) (finding prejudice when information disclosed after summary judgment motion filed but before trial was imminent); Lohnes, 272 F.3d at 60 (failure to unveil expert until after summary judgment motion filed was prejudicial in part because it deprived defendant of opportunity to depose).

Furthermore, Harriman took no steps to minimize the harm caused by the late disclosure.  Harriman's attorney retained an investigator ten days before the defendants' summary judgment motion was due, but did not put the defendants or the court on notice that he was attempting to locate Kane and Sheriff.  Cf. Klonoski, 156 F.3d at 272 (faulting attorney for failing to alert opponent in roughly comparable circumstances).  And while Harriman's attorney was actively looking for them, he sought and received an extension to file an opposition to summary judgment -- not in order to find additional witnesses -- but on the ground that he was busy with other cases and had been sick.  In this light, Harriman's late disclosure begins to look less like an oversight and more like a tactic.

The history of the litigation also cuts against Harriman's position.  This was not the first time Harriman missed a deadline.  He failed previously to designate an expert by the deadline set by the court, and he requested an extension five days

-17-

later.  The magistrate judge initially denied the request, but later -- reluctantly -- allowed it with the caveat that she would permit no further extensions.  Harriman also failed timely to respond to the defendants' request to strike the Kane and Sheriff affidavits.  Here again the magistrate judge gave Harriman one last extension.  Although these infractions may not rise to the level of dereliction displayed in other cases, see, e.g., Santiago-Diaz, 456 F.3d at 277 (referencing the plaintiff's "obvious and repeated" disregard for the court's deadlines), they do place the court's preclusion decision in context.

The late disclosure's impact on the court's docket is apparent.  Harriman disclosed Kane and Sheriff more than seven months after the deadline for initial disclosures, more than two months after the discovery deadline, and about a month after the defendants had moved for summary judgment. District courts have an interest in managing their dockets without such disruptions.  See id. ("Whenever a party, without good cause, neglects to comply with reasonable deadlines, the court's ability to manage its docket is compromised.").

The only factor that favors Harriman is his need for the affidavits.  Reversals based on a sanctioned party's need for precluded evidence are rare, and seldom based on that factor alone.  In one recherché case, Esposito, we reviewed an order that had precluded the plaintiff's only expert because he failed to

designate him in time. 590 F.3d at 72. We reversed, with one judge dissenting, because the parties agreed that preclusion was tantamount to dismissal, and there was no evidence that the plaintiff had disregarded other deadlines or sought to gain a calculated advantage by delay. Id. at 79 (characterizing preclusion there as "a fatal sanction levied for a single oversight").

This case is not of a kind with Esposito. Although including the Kane and Sheriff affidavits would make the propriety of summary judgment less clear, precluding them does not obviously or automatically result in dismissal. See infra Part II.C (discussing propriety of summary judgment). And here, unlike in Esposito, Harriman missed other deadlines and ignored at least one warning that no further extensions would be tolerated. Also, Harriman's timing for the disclosure, coupled with his furtive post-discovery search for additional witnesses, could be viewed as strategic. None of these circumstances was present in Esposito, and we decline to expand Esposito's holding beyond its highly idiosyncratic facts.

In sum, given the above, we cannot fault the district court for precluding the affidavits. Another judge faced with the same facts might have selected a lesser sanction. But preclusion was not "so wide of the mark as to constitute an abuse of discretion." Macaulay, 321 F.3d at 51.

**C.    Summary Judgment**

We turn at last to Harriman's challenge to the summary judgment, which need not detain us.   Our review is de novo. Morelli v. Webster, 552 F.3d 12, 18 (1st Cir. 2009) ("Summary judgment is appropriate only when the record reflects no genuine issue as to any material fact and indicates that the moving party is entitled to judgment as a matter of law.").

Harriman's argument boils down to the following syllogism.   Mitchell's testimony that Harriman was in secure holding at 9 p.m. (as opposed to HD-1) exposed the defendants' lies concerning Harriman's location in the jail.  Because the defendants were lying about Harriman's location, the entirety of "their reports and deposition testimony cannot be believed."  Summary judgment was therefore inappropriate.

We reject this line of reasoning, because Harriman's location in the jail is immaterial.  His claim that the defendants used excessive force is premised on a beating.  Harriman has not shown, nor do we see, any link between his location in the jail and the beating that he alleged occurred.[9]  What remains is a naked attack on the credibility of the defendants' testimony, and that

---

[9]    For the same reason, we reject Harriman's challenge to the authenticity of the jail's segregation log, which placed Harriman in HD-1 during the events in question. Even if Harriman's location in the jail were relevant to his claim (it is not), his basis for challenging the segregation log -- that it "appears to be a fake and untrustworthy" -- is chimerical.

argument is squarely foreclosed by our case law. Lafrenier v. Kinirey, 550 F.3d 166, 167 (1st Cir. 2005); see also Sears, Roebuck & Co. v. Goldstone & Subalter, P.C., 128 F.3d 10, 18 (1st Cir. 1997) ("A party cannot create an issue for the trier of fact 'by relying on the hope that the jury will not trust the credibility of witnesses.'") (quoting Dragon v. R.I. Dep't of Mental Health, Retardation & Hosps., 936 F.2d 32, 35 (1st Cir. 1991)).

We agree with the district court that there was nothing inherently unbelievable about the defendants' testimony. Their testimony was, by and large, consistent. Pileski and Hobbs both saw Harriman fall, and Sullivan and Haines heard sounds in his cell that resembled a fall. And all correctional officers present at the jail that night testified, or submitted affidavits stating, that they did not strike Harriman or see anyone else do so. To be sure, not all of the defendants' testimony was uniform in every respect. As Harriman points out, Haines testified that Harriman was wearing an anti-suicide smock when he entered Harriman's cell; Sullivan, however, thought Harriman was unclothed. But these minor details do not undercut the plausibility of the defendants' testimony that Harriman fell.

Harriman does not identify any admissible facts that raise a genuine issue that one or more correctional officers beat him. Yes, his neurologist, Stephanie Lash, testified that, based on her review of the photographs of Harriman's head taken after his

release, it was "unlikely" that Harriman's injuries "could have occurred by him falling against a flat object" (i.e., a cell wall). But the district court did not consider Lash's opinion, because Harriman never designated her as an expert. Harriman does not refute that he failed to designate Lash, and our review of the record does not reveal that he did. Her testimony is therefore inadmissible. See Fed. R. Evid. 701 (lay opinion testimony inadmissible except in narrow circumstances not applicable here); see also Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 14 (1st Cir. 1998) (inadmissible lay opinion testimony cannot forestall summary judgment).

Even if Lash's testimony were admissible, her conclusion was unsupported: Lash conceded at deposition that she did not purport to opine on the cause of Harriman's injuries.[10] The

---

[10]We provide an excerpt from Lash's deposition:

[**Defendants' Counsel:**] Let me ask you next about how a neurologist such as yourself goes about trying to formulate an opinion as to whether or not there's a causal connection between a traumatic event and cognitive difficulties. How would you go about doing that? What information would you want to have available to you in order to make that determination?

[**Lash:**] With respect to this particular case, how much of this gentleman's cognitive difficulties are due to what individual injury, and I suspect from what we know about it there were probably more than one injury happening to his head, and whether it was fall and striking or several of each, I don't know; and so, frankly, the forensic piece of it is really not the focus of what I spent my time with him. The focus for me is the degree of the injury, and the extent of the injury,

-22-

district court was thus free to disregard that aspect of her testimony. See, e.g., Johnson v. Gordon, 409 F.3d 12, 25-26 (1st Cir. 2005) ("A nisi prius court need not give weight to opinion evidence that is unsupported by an adequate foundation."); see also Maldonago-Denis v. Castillo-Rodrequez, 23 F.3d 576, 583 (1st Cir. 1994) (recognizing that "tenuous assertions strung together by strands of speculation and surmise" cannot defeat summary judgment).

That leaves Harriman's memory. The only thing he remembers that could possibly help him is his recollection of "somebody saying he's had enough or I think that's enough or maybe even that's enough." Harriman conceded at deposition, however,

---

the impact on his life, what we can do to help him as an individual heal, the prognosis, what medications, what therapies, what treatments may or may not be helpful for him. <u>That's really the focus of my time in this particular person's case. It's not who hit whom and who fell where and that sort of stuff really</u>.

[**Defendants' Counsel:**] Let me just see if I can summarize then. Would it be fair for me to say that you do not have any opinions at this time regarding whether or not the events that occurred to him on October 20 of 2006 were the cause of his cognitive difficulties?

[**Lash:**] Based on the history from he and his wife, in a general sense I think he suffered a severe injury and in a general sense think that he has ongoing health problems because of it. So to that extent I have belief in the importance of those injuries, but <u>any of the specifics of what went on that evening or the subsequent couple of days I really have no opinion about</u>.

(Emphasis supplied.)

-23-

that he had no memory of being beaten by anyone at anytime relevant to this case.  The district court was correct that no reasonable jury could return a verdict in Harriman's favor on that basis. See, e.g., Wysong v. City of Health, 260 Fed. App'x 848, 857 (6th Cir. 2008) (no genuine issue in light of plaintiff's concession that he did not remember whether he resisted arrest).

In the end, the record does not support Harriman's hypothesis that the defendants inflicted a constitutional injury. His claim for excessive force therefore fails, and the corollary is that municipal liability cannot attach.  City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); Wilson v. Town of Mendon, 294 F.3d 1, 6 (1st Cir. 2002).

## III.  CONCLUSION

For these reasons, the judgment of the district court is **affirmed**.  Costs to appellees.