**Denise McGRATH, Administratrix of the Estate of Anthony W. McGrath, Plaintiff,**

v.

**Richard T. TAVARES, Edwin F. Almeida, Robert J. Pomeroy, and The Town of Plymouth, Defendants.**

**Civil Action No. 2009–10004–RBC.**

United States District Court, D. Massachusetts.

May 4, 2012.

9. The Court will contemporaneously issue an Order consistent with this Memorandum

Opinion.

Paul J. Driscoll, Donald L. Gibson, Driscoll & Gibson, Marshfield, MA, for Plaintiff.

Andrew J. Gambaccini, Austin M. Joyce, John K. Vigliotti, Reardon, Joyce & Akerson, P.C., Worcester, MA, Leonard H. Kesten, Judy A. Levenson, Brody, Hardoon, Perkins & Kesten, Boston, MA, for Defendant.

*MEMORANDUM AND ORDER ON DEFENDANTS, RICHARD T. TAVARES'S AND EDWIN F. ALMEIDA'S, MOTION FOR SUMMARY JUDGMENT (# 64)*

COLLINGS, United States Magistrate Judge.

### I. *Prior Proceedings*

Plaintiff, Denise McGrath, brought this action on behalf of Anthony McGrath's es-

tate against defendants Richard Tavares (Tavares), Edwin Almeida (Almeida), Robert Pomeroy (Pomeroy), and the Town of Plymouth (collectively, "defendants") on January 5, 2009. (# 1) The defendants filed an answer to the complaint with a demand for a jury trial on February 9, 2009. (# 6) On December 7, 2010, the defendants filed a motion for summary judgment along with a memorandum in support, and a statement of undisputed material facts with exhibits. (## 64–66)

On December 14, 2010, plaintiff filed a motion to limit the scope of defendants' summary judgment motion to the Count I claims against Tavares and Almeida, which was granted on December 29, 2010 after no opposition was filed. (# 67) Count I is against Tavares, Almeida, and Pomeroy for a violation of McGrath's civil rights to be free from unreasonable search and seizure under 42 U.S.C. § 1983. (# 1, ¶¶ 37–40) On February 10, 2011, plaintiff filed a memorandum in opposition to the defendants' motions for summary judgment, a response to the defendants' statement of undisputed material facts, a statement of material facts, and a manual filing of exhibits. (## 70–73) On March 24, 2011, defendants filed a reply to plaintiff's response to summary judgment. (# 79)

## II. Factual Background

The relevant undisputed facts and the disputed facts with reasonable inferences taken in favor of the plaintiff are as follows.[1] In the early morning of January 10, 2006, police officers Almeida and Tavares were on duty in Plymouth, Massachusetts. (# 71, Fact Nos. 1–4) Around 3:15 A.M., Almeida received a dispatch to a local liquor store because the burglar alarm had activated. (# 71, Fact No. 3) On his way to the liquor store, Almeida observed a Toyo-

ta Camry stopped at an intersection about 150 to 300 feet from the liquor store. (# 71, Fact Nos. 5–7) Almeida saw the Camry turn left at the intersection. (# 71, Fact No. 10) At the time the Camry turned left, it had a green light. (# 72, ¶¶ 5–8)

After the Camry turned, Almeida activated his siren and turned to stop the Camry. (# 71, Fact No. 16) At the time Almeida followed the Camry and activated his lights, all Almeida knew was that the Camry was near the liquor store. (# 72, ¶ 2) As the car turned Almeida noticed that the car had only one commercial license plate. (# 71, Fact No. 14) Almeida saw the operator of the Camry was wearing a hooded sweatshirt but did not otherwise recognize him. (# 71, Fact No. 13) The decedent, Anthony McGrath (McGrath), was the operator of the Camry and did not initially stop or attempt to pull over when Almeida followed him southbound (# 71, Fact No. 17), but was going close to the speed limit. (# 72, ¶ 11) While following McGrath, Almeida advised dispatch that the car he attempted to pull over was "running." (# 71, Fact Nos. 20–3) Tavares heard the car "was running" as he was going to respond to the burglar alarm and told dispatch he would respond to Almeida's position. (# 71, Fact Nos. 23–4)

Almeida followed McGrath for a couple minutes but most of the time his cruiser was not traveling at high speeds, which suggests that both cars were traveling at safe speeds until McGrath started to proceed down Water Street. (# 72, ¶ 11; Plaintiff's Ex. 14; Plaintiff's Ex. 24–1) While on Water Street, McGrath was traveling at a high rate of speed. (# 66, ¶ 33) After Tavares joined the vehicular pursuit, McGrath failed to negotiate a T intersec-

---

1. Where the facts submitted by the defendants differ from the facts submitted by the plaintiff, the plaintiff's facts are listed so long as they are supported by evidence which is admissible. Rule 56(c)(4), Fed.R.Civ.P.

tion and crashed into a stone wall. (# 71, Fact Nos. 32–4) Almeida and Tavares pulled their cruisers behind the Camry on the driver's side and passenger's side respectively. (# 71, Fact No. 35) At this point, Almeida got out of his cruiser, drew his gun, and shouted commands for McGrath to get out the car and show his hands. (# 71, Fact No. 36) McGrath then reversed the car, backed off the wall, and went in between the two cruisers striking Almeida's cruiser in the process of backing up. (# 71, Fact Nos. 38, 40) Tavares did not exit his cruiser until after McGrath cleared both cruisers. (# 72, ¶ 14) McGrath continued to reverse until the Camry hit a telephone pole where it stayed for five to ten seconds. (# 71, Fact Nos. 41–2)

During the five to ten seconds, Tavares approached the Camry and saw McGrath sitting with both hands on the steering wheel looking at him. (# 71, Fact Nos. 43–4) Tavares shouted commands for McGrath to turn off and exit the Camry. (# 71, Fact No. 45) Both officers had their weapons drawn and pointed at McGrath. (# 71, Fact No. 47)

McGrath drove off the pole and the Camry ended up traveling across Water Street. (# 71, Fact No. 50) The plaintiff contests where Tavares was when the Camry started to move forward, but was not able to produce affirmative evidence to dispute Tavares's testimony. (# 72, ¶¶ 18–9) Tavares stated in his deposition that the Camry came toward him as it moved off the pole.[2] (Plaintiff's Ex. 23–1, p. 187) After the Camry began to move off the pole, Tavares fired four shots. (# 71, Fact Nos. 51–4) Two of Tavares's shots hit the front windshield of the Camry and one of these shots hit McGrath in the back of his

right arm. (# 71, Fact Nos. 52, 55) Tavares took the other two shots as the Camry was passed him; one of these shots shattered the right front passenger window and struck McGrath in the back, which was the fatal shot. (# 71, Fact Nos. 53–5)

Tavares considered himself out of danger when he fired the third and fourth shots and did not see where Almeida was until after he stopped shooting.[3] (# 72, ¶ 17 e–h) Tavares testified that he knew Almeida was somewhere to his right and that he shot at the Camry because he was concerned about Almeida's safety. (Plaintiff's Ex. 23–1, p. 218) Almeida testified that he was in a cover position when Tavares shot at McGrath. (Plaintiff's Ex. 23–3, p. 233) Almeida describes the cover position as a position that "allows [the officer in the contact or primary position] . . . to freely concentrate on that person and to protect him, look around the general area to make sure he is safe." (Plaintiff's Ex. 23–3, p. 233)

Almeida also fired seven shots at McGrath, including some that hit the passenger side of the Camry, but none struck McGrath. (# 71, Fact Nos. 56–7) When Almeida fired he was in-between his cruiser and the curb of the street, not in the path that the Camry took to its final resting spot. (# 72, ¶ 29) The vehicle finally stopped on the lawn across the street from the telephone pole. (# 71, Fact Nos. 41, 50, 60) The officers took McGrath out of the car and handcuffed him. (# 71, Fact No. 66) At some point when McGrath was unconscious and unresponsive, he developed large abrasions on his wrists from the handcuffs. (# 72, ¶ 32) After handcuffing McGrath, the officers noticed labored

---

2. Both Tavares's and Almeida's police reports also indicate that the Camry drove toward Tavares as it came off the pole. (Plaintiff's Ex. 5 ¶ 7; Plaintiff's Ex. 7 ¶ 7)

3. Tavares does not recall shooting the fourth shot, he only remembers shooting a total of three times during the incident. (Plaintiff's Ex. 23–1, p. 200)

breathing and found the gunshot wounds. (# 71, Fact Nos. 66, 69, 71) An ambulance arrived and took McGrath to the hospital where he was pronounced dead at 5:01 A.M. on January 10, 2006. (# 71, Fact Nos. 76–7)

### III. Summary Judgment Standard

The purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Rojas–Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico,* 394 F.3d 40, 42 (1 Cir., 2005) (internal quotations marks and citation omitted). When considering a motion for summary judgment, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(a). The moving party bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top–Flite Golf Co.,* 335 F.3d 15, 19 (1 Cir., 2003) (citations omitted). "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." *Fontánez–Núñez v. Janssen Ortho LLC,* 447 F.3d 50, 54–55 (1 Cir., 2006) (internal quotation marks and citation omitted).

In determining whether summary judgment is proper, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Clifford v. Barnhart,* 449 F.3d 276, 280 (1 Cir., 2006). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). " 'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.' " *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)(further internal quotation marks omitted)).

The Third Circuit has noted that in cases concerning the unreasonable use of deadly force it is particularly important to look at circumstantial evidence that discredits the police officer's story or testimony. *See Abraham v. Raso,* 183 F.3d 279, 294 (3 Cir., 1999); *see also Scott v. Henrich,* 39 F.3d 912, 915 (9 Cir., 1994), cert. denied, 515 U.S. 1159, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995). However, a plaintiff cannot avoid summary judgment simply by challenging the officer's credibility generally; there must be some affirmative evidence that would allow the jury to infer that the testimony was incorrect.[4] *See Harriman v. Hancock Cnty.,* 627 F.3d 22,

---

**4.** The First Circuit noted in *LaFrenier v. Kinirey* that since the plaintiff failed to prove there were "inherent inconsistencies" in the officer's testimony, the decision did not address whether proof of inherent inconsistencies would be enough to avoid summary judgment. 550 F.3d 166 at 167–68. In *Harriman v. Hancock,* the First Circuit noted that pointing to one or two inaccuracies in the officer's testimony related to an immaterial fact is not enough evidence to infer that his entire report or testimony is inaccurate. 627 F.3d 22 at 23–4.

32–3 (1 Cir., 2010); *LaFrenier v. Kinirey,* 550 F.3d 166, 167 (1 Cir., 2008); *Moreau v. Gerardi,* 2010 WL 4961676, **4–6 (D.Mass., Nov. 24, 2010); *see also Sears, Roebuck & Co. v. Goldstone & Sudalter,* 128 F.3d 10, 18 (1 Cir., 1997).

### IV. Prelude

At oral argument, plaintiff's counsel conceded that there was no issue as to the legality of the officers' actions in deciding to stop McGrath and in taking actions to effectuate a stop after they had called in the plate and received information back that the plate did not belong to the car McGrath was driving. The central issue concerns whether, on the facts taken in the light most favorable to the plaintiff from evidence which would be admissible at trial, the use of deadly force by Tavares was objectively reasonable.

### V. Discussion

#### A. Tavares's Use of Force with Shots One and Two[5]

##### 1. Lack of a Genuine Issue of Fact

■ The plaintiff argues there is a genuine issue of fact concerning where Tavares was standing as the Camry came off the pole and, as a result, whether he was ever in danger. The plaintiff rests her argument that the Camry was not driven in the direction of Tavares at the time he fired the first two shots at McGrath upon police photographs of the gunshots in the windshield of the Camry and inconsistencies in Tavares's account of the incident, including his location prior to the Camry colliding with the pole. (# 72, ¶¶ 12–15, 19)

While all circumstantial evidence must be considered heavily in a case such as this one, to dispute Tavares's testimony about his location when he took the first two

shots the only circumstantial evidence to which the plaintiff points is photographs of bullet holes in the windshield of the car. (# 72, ¶ 19(a)) From those photos the plaintiff concludes the shots were "not fired from directly in front of the Camry." (# 72, ¶ 19(a)) However, plaintiff's lay opinion as to the meaning of the shots in the windshield is not admissible evidence. See Fed.R.Evid. 701. The plaintiff does not present a ballistics expert to interpret the bullet holes and reach that conclusion. (# 72, ¶ 19(a)) In fact, the Collision Analysis & Reconstruction Section Forensic Mapping Report done by the State Police during the police investigation of this incident concludes that "due to a variety of factors, such as variations in the terrain, motion of the vehicle, and motion of the officers involved during the incident, it is not possible to accurately represent the exact dynamic trajectories of the bullets as they entered the vehicle." (Plaintiff's Ex. 11–1, ¶ 7) As a result, the only evidence that is before the Court concerning Tavares's position during the first two shots are the accounts of Tavares and Almeida that the car was driven at Tavares as it came off the pole.

The plaintiff also argues that Tavares's testimony concerning his location throughout the incident is inconsistent, so his testimony as to whether the car was driven at him should not be believed. The plaintiff specifically points to two inconsistencies in Tavares's testimony: 1) concerning an evasive maneuver he claims to have made to avoid McGrath's car during the pursuit (# 72, ¶¶ 12–13) and 2) concerning Tavares being out of his cruiser and needing to jump out of the way when McGrath backed away from the wall (# 72, ¶¶ 14–15).

---

**5.** Neither of these shots were the fatal shot. However, one of these shots did hit McGrath in the arm.

In the *Harriman* case, the plaintiff tried to discredit the defendant's testimony by pointing out that two officers's testimony differed as to the plaintiff's location in the jail at specific time and that one officer said he was wearing an anti-suicide smock when they found him and another said he was naked. 627 F.3d at 23–24. The First Circuit explained that these facts were not material to the plaintiff's excessive force claims and that there was "nothing inherently unbelievable about the defendants' testimony." *Harriman,* 627 F.3d at 33. Therefore, the First Circuit concluded the essence of the plaintiff's argument was a lack of witness credibility, which is not a basis for avoiding summary judgment. *Harriman,* 627 F.3d at 32–33.

■ Similarly here, Tavares's location as McGrath backed up and whether he made an evasive maneuver during the pursuit are immaterial to the determination of the reasonableness of the later use of deadly force. As stated, supra, for the purpose of summary judgment, the plaintiff's version that Tavares did not make an evasive maneuver and that Tavares was in the car when the plaintiff began to back up are accepted. While actions prior to a seizure occurring are examined to determine reasonableness of the use of deadly force, *St. Hilaire v. City of Laconia,* 71 F.3d 20, 26–7 (1 Cir., 1995), *cert. denied,* 518 U.S. 1017, 116 S.Ct. 2548, 135 L.Ed.2d 1068 (1996), even assuming plaintiff's version with respect to these facts are correct, it does not affect the determination as to whether the later the use of deadly force was reasonable.

Furthermore, the undisputed evidence is that by the time McGrath had backed up to the point where he hit the pole, Tavares was out of the cruiser with McGrath's vehicle pointed in his direction. Almeida's account is consistent with that of Tavares regarding the vehicle being driven at Ta-

vares when the first two shots were taken, and there is no circumstantial evidence to contradict it, the testimony is not inherently unbelievable. As a result, the plaintiff is essentially resting her argument upon raising an issue of credibility, which cannot on its own create an issue of material fact.

*2. Constitutional Violation for Tavares's Shots One and Two*

■ It is reasonable for a police officer to use deadly force if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to [himself] or to others." *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *see also Scott,* 550 U.S. at 386, 127 S.Ct. 1769 (holding use of deadly force to end a car chase where the driver was recklessly driving and endangering the public was objectively reasonable); *Sanders v. City of Minneapolis, Minn.,* 474 F.3d 523, 526 (8 Cir., 2007) (holding use of deadly force was objectively reasonable when plaintiff backed his car into a security vehicle and then accelerated toward two officers who were close to his vehicle). A vehicle can be a weapon that threatens the safety of an officer or others. *See Williams v. City of Grosse Pointe Park,* 496 F.3d 482, 486 (6 Cir., 2007)(finding that decedent who drove car in a manner that caused a police officer with his arm in the car to be knocked over was using the car as a weapon); *see generally Scott,* 550 U.S. 372, 127 S.Ct. 1769 (holding danger posed to the public by reckless driving was enough to justify use of deadly force).

■ In this case, Tavares shot at McGrath twice when the car was driven in the direction where he was standing. This posed an immediate threat of serious harm to him and could reasonably been interpreted as a threat to his safety by use the use of the vehicle as a weapon, so the

initial two shots were objectively reasonable on grounds of self defense.

## B. Tavares's Use of Force with Shots Three and Four

### i. Lack of a Genuine Issue of Material Fact

■ Tavares was out of danger when he fired the third and fourth shots. Therefore, the self defense justification that made shots one and two reasonable cannot justify the fatal shot. Tavares testified in his deposition and included in his police report that he took shots three and four due to a concern for Almeida's safety.

The plaintiff argues that there is a dispute of material fact as to where Almeida was standing and whether he was ever actually in danger. There is a dispute of fact as to Almeida's location. The Lieutenant leading the state police investigation of this incident stated that Almeida was to the right of Tavares in between his police cruiser and the curb of the street (Plaintiff's Ex. 22–3; Plaintiff's Ex. 23–7, p. 156) and Almeida indicated that he was to the right of Tavares but closer to the middle of the road and the Camry (Plaintiff's Ex. 22–3; Ex. 23–3, p. 238–39). However, this fact is not material to determining whether Tavares's use of deadly force was objectively reasonable. The reasonableness of Tavares taking shots three and four is based upon whether it was reasonable for Tavares to believe that Almeida was in the immediate vicinity[6] and in danger. Tavares stated that he did not see where Almeida was but that he knew he was somewhere to his right. (Plaintiff's Ex. 23–1, p. 218, 221) Almeida's police report supports this assertion by explaining that once he saw Tavares in front of the Camry giving instructions, he moved into "cover position" to the right of Tavares. (Plaintiff's Ex. 7, ¶ 11) Almeida describes the cover position as a position that "allows [the officer in the contact or primary position] ... to freely concentrate on that person and to protect him, look around the general area to make sure he is safe." (Plaintiff's Ex. 23–3, p. 233)

In addition, the reasonableness of Tavares's belief that Almeida was to his right in cover position is further corroborated by facts that suggest Almeida actually was to Tavares's right. Under either Almeida's or the Lieutenant leading the investigation's version the facts, Almeida was to Tavares's right when Tavares fired shots three and four. Additionally, some of the bullet holes along the passenger's side of the car were attributed to Almeida's shots. This suggests that Almeida was in fact positioned to the right of Tavares, since some of Almeida's shots hit the same side of the car as Tavares's third or fourth shot which were taken as the Camry passed him.

### ii. Constitutional Violation Due to Tavares's Shots Three and Four

■ Apprehension of a suspect by use of deadly force is a seizure. *Garner*, 471 U.S. at 6, 105 S.Ct. 1694. Claims under the Fourth Amendment right to be free from an unreasonable search and seizure are analyzed under an "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The objective reason-

6. The exact distance between the officers and the car at any given point in this incident is not stipulated by either party. However, the map created for the State Police investigation of the incident suggests that there was approximately 60 feet between the Camry's position when it initially crashed against the wall and where it crashed into the pole. (Plaintiff's Exs. 22–1 to 22–4) It also suggests that there was approximately 52 feet between the Camry's position at the pole and where it finally stopped. (Plaintiff's Exs. 22–1 to 22–4)

ableness of force used is analyzed by balancing "'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake.'" *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 148 (1 Cir.) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865), *cert. denied*, 540 U.S. 1017, 124 S.Ct. 573, 157 L.Ed.2d 431 (2003). "[T]he 'calculus of reasonableness' must make 'allowance' for the need of police officers 'to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Roy v. Inhabitants of the City of Lewiston*, 42 F.3d 691, 695 (1 Cir., 1994) (quoting *Graham*, 490 U.S. at 396-7, 109 S.Ct. 1865); *see also Estate of Bennett v. Wainwright*, 548 F.3d 155, 175-6 (1 Cir., 2008).

In addition to the objectively reasonable standard, the Supreme Court has set boundaries for the use of deadly force: "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead," but if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Garner*, 471 U.S. at 11, 105 S.Ct. 1694.

Use of deadly force by police can be justified by a reasonable concern for the safety of others in the immediate vicinity of a car that is either being recklessly driven or intentionally used as a weapon. *Waterman v. Batton*, 393 F.3d 471, 478-79 (4 Cir., 2005); *Scott v. Edinburg*, 346 F.3d 752, 758-60 (7 Cir., 2003). Further, the other does not need to be in the direct path of the car for the concern to be objectively reasonable. *Waterman*, 393 F.3d at 479-80; *Scott*, 346 F.3d at 759.

In *Scott*, an off-duty officer shot a man who was driving away after stealing the officer's car from a gas station parking lot. 346 F.3d at 754-55. There were many disputes of fact in this case, but it was undisputed that there were twelve to fourteen patrons of the gas station in the immediate vicinity, that the decedent committed a felony by stealing the car and had placed the off-duty officer in danger previously by backing up toward him. *Scott*, 346 F.3d at 759. The Seventh Circuit held that the officer's actions were objectively reasonable due to a concern for the safety of the patrons in the immediate vicinity regardless of whether they were in the direct path of the car or not. *Id.*

In *Waterman*, Waterman did not stop when an officer attempted to pull him over for speeding, which resulted in a pursuit. 393 F.3d at 473. The officers who later shot Waterman heard a report that during the pursuit Waterman tried to run an officer off the road. *Waterman*, 393 F.3d at 474. Officers on foot saw the car lurch forward and then accelerate in their general direction and shot at the vehicle. *Waterman*, 393 F.3d at 474-5. At this moment, the first officer was standing approximately sixteen feet ahead of the vehicle and the last officer standing approximately seventy-two feet ahead of the vehicle. *Waterman*, 393 F.3d at 474. The Fourth Circuit held that the use of deadly force was objectively reasonable given the previous aggression toward an officer trying to capture him, and that he was driving in the general direction of officers on foot, including at least one that could have been killed or seriously injured "within a fraction of a second." *Waterman*, 393 F.3d at 480. The court explained that a factor in the assessment was that he could turn toward officers in the immediate vicinity but not yet in his direct path and that the officers were too

close to confirm his path without affecting their ability to protect themselves. *Id.*

■ In this case, since Tavares stated he was no longer in danger at the time he fatally shot McGrath, the reasonableness of his use of deadly force in shots three and four must be judged according to whether it was objectively reasonable to believe there was an imminent threat to Almeida. As in *Scott,* where the off-duty police officer knew that twelve to fourteen patrons were in the vicinity of a car that had just been backed up toward him, Tavares knew Almeida was out of his cruiser on his feet and believed he was in the vicinity to his right where the Camry was headed. As in *Waterman,* where Waterman attempted to run officers off the road prior to his car lurching and accelerating generally towards officers's position on foot, here McGrath drove his vehicle toward Tavares and then drove to Tavares's right where Tavares believed Almeida was located. Like in *Scott* and *Waterman,* here the use of force was also objectively reasonable given that the situation was quickly evolving and Tavares had reason to believe the Camry which had previously been driven toward him was headed in the general direction of Almeida.

At the time he fired, Tavares knew that McGrath had driven at excessive speeds during the chase, had skid seventy feet trying to navigate a turn from Water Street to Nelson Street and slammed into a wall when he failed to make the turn. He knew that McGrath had ignored all of the officers's commands. He further knew that rather than obey the officers's commands, McGrath put his car into reverse and drove backward sideswiping one of the cruisers in the process until he backed into a telephone pole. Tavares knew that at this point, McGrath looked directly at him with both hands on the wheel of the car and saw that Tavares was holding a gun

and issuing commands. Despite this, McGrath drove the car forward. Even after Tavares had fired two shots into the car, McGrath did not stop but rather continued forward toward a general area where it was reasonable to believe Almeida was located. It is not required that Tavares wait for Almeida to be actually in the Camry's path before acting to protect his partner's safety.

At oral argument, plaintiff's counsel argued that since the Camry ended up on the opposite side of Water Street from the pole on the grass after having jumped the curb and gone through some bushes, it was not objectively reasonable for Tavares to think that Almeida was in danger because it is undisputed that Almeida was not in the grassy area. The plain fact is that at the time Tavares fired the fatal shot, he had no idea in which direction McGrath was going to go except that McGrath was headed in the direction where he reasonably thought Almeida would be. In fact, the more reasonable inference would be that McGrath was going to try to escape by driving between Almeida's cruiser and the curb and make a left hand turn on Nelson Street in order to escape. But the main point is that in view of McGrath's erratic and reckless driving, which Tavares had personally witnessed, it was objectively reasonable for Tavares to believe that McGrath posed a real and imminent threat to Almeida's safety. Further, the Court finds no inherent inconsistencies in Tavares's statements as to material matters and finds the statements as to what occurred at the intersection of Water and Nelson Streets to be generally consistent with all the other admissible evidence in the summary judgment record.

Since Tavares's actions in firing the third and fourth shots were objectively reasonable, there is no constitutional violation and summary judgment as to Count I

against Tavares and Almeida alleging an unreasonable search and seizure must be granted.[7] There is no reason to address the defendants' qualified immunity defense, since it has been determined that the use of force was objectively reasonable.

### VI. Conclusion

For all the reasons stated, it is OR-DERED that Defendants, Richard Tavares's and Edwin Almeida's, Motion for Summary Judgment (# 64) as to Count I be, and the same hereby is, ALLOWED. A Procedural Order shall issue as to what disposition shall be made of the other counts of the complaint and the other defendant charged in Count I.

---

**7.** The plaintiff has also alleged that Almeida used excessive force. A claim for an unreasonable search and seizure as a result of excessive force has two elements: a seizure and that the use of force was unreasonable. *Scott,* 550 U.S. at 381, 127 S.Ct. 1769 (citing *Brower v. County of Inyo,* 489 U.S. 593, 599, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989)). Since Almeida fired seven times but never hit McGrath's person, there is no seizure.